MALCOLM MILLER, *Appellant,* v. FOULSTON, SIEFKIN, POWERS & EBERHARDT, a Kansas Partnership; and ROBERT C. FOULSTON, ROBERT N. PARTRIDGE, JOHN F. EBERHARDT, ROBERT M. SIEFKIN, RICHARD C. HARRIS, GERALD SAWATZKY, ROBERT L. HOWARD, CHARLES J. WOODIN, MIKEL L. STOUT, MICHAEL KIM MOORE, WILLIAM R. SAMPSON, CHRISTOPHER P. CHRISTIAN, JERRY G. ELLIOTT, BENJAMIN C. LANGEL, WILLIAM H. DYE, PHILLIP S. FRICK, STANLEY G. ANDEEL, FREDRICK L. HAAG, RICHARD D. EWY, DARRELL L. WARTA, HARVEY R. SORENSEN, JAMES M. ARMSTRONG, MARY KATHLEEN BABCOCK, CHARLES P. EFFLANDT, and JAMES D. OLIVER, individuals in said partnership, *Appellees.*

(790 P.2d 404)

Opinion filed April 13, 1990.

*Frederic Dorwart,* of Holliman, Langholz, Runnels & Dorwart, of Tulsa, Oklahoma, argued the cause, and *James D. Bryant,* of the same firm, and *Mark G. Ayesh,* of Ayesh, Herd & Theis, of Wichita, were with him on the briefs for appellant.

*Arden J. Bradshaw,* of Michaud, Hutton & Bradshaw, of Wichita, argued the cause and was on the brief for appellees.

*John Terry Moore,* of Hinkle, Eberhardt & Elkouri, of Wichita, was on the brief for appellee Christopher P. Christian.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a civil action brought by the plaintiff, Malcolm Miller, against the law firm of Foulston, Siefkin, Powers & Eberhardt (Foulston-Siefkin) and his former partners. The plaintiff involuntarily left the firm under pressure, and, although he alleges ten separate claims in his petition, the basis of his action is that he should receive retirement benefits and a share of the attorney fees the firm received for its 20-year litigation in two sets of class action cases that have become known as the consolidated and the private helium cases. The district court denied plaintiff's motion for partial summary judgment and granted summary judgment to defendants on the grounds the claims were barred by the statute of limitations. Miller appeals from that judgment.

Miller began practicing with Foulston-Siefkin in 1952. In a memo dated May 13, 1982, the executive committee of Foulston-Siefkin advised plaintiff that it was concerned about his participation in the firm and was suggesting a substantial reduction in compensation. In December 1982, plaintiff was advised by memorandum from "his partners" of their desire for him to resign rather than face expulsion. Fifteen partners signed the memo. It was based upon a unanimous recommendation from the executive committee that plaintiff be expelled from Foulston-Siefkin. Plaintiff left the firm January 1, 1983. He was of counsel with the firm until February 28, 1983, when he was required to remove

all his belongings from the firm's offices. Plaintiff never intended to retire from the practice of law when he left Foulston-Siefkin.

Foulston-Siefkin first became involved in complex helium litigation in 1963. One set of cases in this class action became known as the consolidated helium cases. One of these cases settled in 1985, the others in 1988. The court awarded attorney fees of approximately $17 million. The second set of cases, known as the private helium cases, which were filed in 1971 and 1986, resulted in attorney fees of approximately $4.5 million. According to plaintiff, he suggested to his partner, Gerald Sawatzky, that Foulston-Siefkin seek a consensual achievement fee in the helium litigation but was told that such a request was not possible because the attorney time had been billed at a high rate throughout the litigation. This claim was denied by Sawatzky. His affidavit states that the continuous agreement with Foulston-Siefkin's clients in the helium cases was that the firm would bill at a minimum level with the understanding that, if recovery occurred, the court would be asked to award attorney fees from the amount recovered at full compensation.

Plaintiff and Foulston-Siefkin disputed whether plaintiff should receive retirement benefits. At one point, the firm agreed to pay plaintiff retirement benefits in the amount of $190,416.89 in 120 equal installments of $1,586.81, beginning June 1, 1983, conditioned upon plaintiff's retirement. In May 1983, at the Foulston-Siefkin partnership meeting, it was reported that the firm would begin paying these retirement benefits. In the fall of 1983, plaintiff and Foulston-Siefkin attempted to negotiate a settlement which would allow plaintiff to continue some activity in the practice of law while remaining retired and receiving retirement benefits under the 1965 Foulston-Siefkin partnership agreement. Pursuant to the proposal, Foulston-Siefkin agreed to pay plaintiff $190,000 over ten years while liberalizing the phrase "practice law" contained in the partnership agreement to allow some minimal activity. Foulston-Siefkin offered to pay plaintiff $2,000 a month for 96 months if he restricted his practice to "permitted activities."

In December 1985, plaintiff learned that Foulston-Siefkin had sought extraordinary attorney fees in the helium cases. Foulston-Siefkin first received payment on those fees in December 1985. Plaintiff sought to have a portion of the helium fees, but his

request was denied. He filed the original petition on November 30, 1987. He filed his amended petition, which alleges the ten claims against the defendants, on January 20, 1989.

Plaintiff filed a motion for partial summary judgment on October 26, 1988, asking the trial court to find: (1) that the 1965 Foulston-Siefkin partnership agreement was void under the Kansas Code of Professional Responsibility, DR 2-108(A) (1989 Kan. Ct. R. Annot. 159); or, in the alternative, (2) that the withdrawal, retirement, and expulsion portions of the 1965 agreement are void under the Code of Professional Responsibility. The trial court denied the motion, finding that the 1965 agreement did not violate any ethical code and that plaintiff did not retire, which meant that he was not entitled to retirement funds available under the 1965 agreement.

Defendants (except Christopher P. Christian) filed a motion for summary judgment, arguing plaintiff's claims were time barred. The trial court found that the longest applicable statute of limitations was three years; that the action should have commenced about the end of 1985 or the early part of 1986; and that, because the action was not commenced until late in 1987, the claims were barred. The court further found that plaintiff's status in the law firm gave him knowledge that would include an awareness of the potential attorney fees that could be produced under the helium litigation even though the exact amount of anticipated fees was not known in late 1982. Finally, the court concluded that, even though plaintiff's claims are time barred, they might provide offsets to defendants' counterclaims. The defendants dismissed their counterclaims on March 13, 1989. Defendant Christian's motion for summary judgment was granted on March 27, 1989, based upon the same grounds as the others.

Plaintiff argues that the trial court erred in denying his motion for partial summary judgment because the 1965 Foulston-Siefkin partnership agreement is unethical and unenforceable in two ways. First, plaintiff argues that the agreement on its face restrains the practice of law and does not comply with the requirements of DR 2-108 (1989 Kan. Ct. R. Annot. 159) of the Kansas Code of Professional Responsibility, which allows for conditional payment of retirement benefits. Second, plaintiff argues that Foulston-Siefkin attempted to use the agreement to compel plain-

tiff to quit practicing law, which would also violate DR 2-108. Finally, plaintiff argues that, because the agreement's restraint on the practice of law was unethical and unenforceable, the entire 1965 partnership agreement is invalid and should be found to be void.

We first consider if the conditional payment of retirement benefits make the 1965 agreement unethical and unenforceable on its face. DR 2-108(A) is intended to give clients the widest possible choice of attorneys by providing as follows:

"A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as a condition to payment of retirement benefits." 1989 Kan. Ct. R. Annot. 159.

The purpose behind DR 2-108(A) is to protect the public's right "to select and repose confidence in lawyers of their choice without restriction by providing full availability of legal counsel." *Cohen v. Lord, Day & Lord*, 144 App. Div. 2d 277, 280, 534 N.Y.S.2d 161 (1988), *rev'd* 75 N.Y.2d 95, 551 N.Y.S.2d 157 (1989).

The partnership agreement challenged by plaintiff was adopted by Foulston-Siefkin on April 1, 1965. Twelve partners signed the "Amended Partnership Agreement," including plaintiff. Article I contains definitions of terms used in the agreement. "Retirement and Retiring partner" are defined in Article I(h) as "withdrawal from the partnership, other than upon death, in a manner and at the times set forth in Section 3 of ARTICLE VII." "Withdrawal and withdrawing partner" are defined in Article I(i) as "withdrawal from the partnership other than upon death, retirement or expulsion." Article I(j) states:

"Expulsion—shall mean expulsion from the partnership under the provisions of Section 5 of ARTICLE VII; provided, however, that any partner who is expelled and who, under the provisions of Section 5 of ARTICLE VII, is entitled to the rights and payments provided upon retirement shall not be regarded as an expelled partner but shall be considered for all purposes as having withdrawn in retirement and as being a retired partner."

Article VII sets out how the partnership will respond to death, retirement, withdrawal, and expulsion of one of the partners. Article VII, § 1 establishes that the occurrence of one of these four events will not terminate the partnership, but will end claims

of that partner against the partnership except as set forth in the agreement. Article VII, § 2(a) defines the payments that will be received upon the death or retirement of a partner:

"(i) Such partner's full drawing account for the month in which his death or retirement occurs.
"(ii) Such partner's capital account as of the end of the month immediately preceding the month in which his death or retirement occurs.
"(iii) An amount equal to such partner's share of partnership profits, as defined in Section 3 of ARTICLE VI, for either the fiscal year of the partnership first preceding the date of such death or retirement, or for the fiscal year second preceding the date of such death or retirement, whichever is greater, provided, however, that for purposes of this computation, there shall be excluded from partnership net profits that portion of any single fee paid within any such year which is in excess of $75,000.00"

Article VII, § 3 outlines the provisions by which a partner retires from the firm, as follows:

"Retirement. A partner who withdraws from the partnership for the purpose of retiring from the practice of law shall be considered as a retired partner and shall be entitled to payments provided for in Section 2 of this ARTICLE VII upon retirement, if, at the time of such withdrawal, such partner
(a) is sixty (60) years of age, or
(b) has been associated with the partnership, whether as a partner or as an associate, or both, for at least thirty (30) years, or
(c) is, in the unanimous opinion of all remaining partners, unable to continue in the practice of law by reason of a permanent physical or mental disability,
provided, however, that notwithstanding any provision in this agreement to the contrary, if such retired partner, without the express consent of all continuing partners, re-enters the practice of law or becomes otherwise gainfully engaged or employed at an occupation associated with or related to the practice of law, then, and upon such event, the obligation of the partnership to make the payments set forth in clause (iii) of Section 2(a) of this ARTICLE VII shall immediately cease and terminate and be forever forfeited by such retiring partner, and any amounts which have theretofore been paid by the partnership to such retired partner under clause (iii) of Section 2(a) shall be, upon demand of the partnership, immediately repaid by such retired partner to the partnership."

In Article VII, § 4, the agreement states that if a partner withdraws other than in retirement, the withdrawing partner is entitled to a portion of the drawing account and that partner's capital account. No provision is made for the receipt of retirement funds by a withdrawing partner.

The expulsion of a partner is defined in Article VII, § 5 as follows:

"Expulsion. Any partner may be expelled at any time, with or without cause, by a majority of partners, and upon such expulsion, such expelled partner's status as a partner shall immediately terminate and such partner shall forthwith terminate his practice of law with the partnership. Such expelled partner shall be entitled to the same payments at the same times and subject to the same terms and conditions as provided in Section 4 above with respect to a withdrawing partner, the same as if such partner had withdrawn and had not been expelled; provided, however, that if such expelled partner, at the time of expulsion, meets the conditions for retirement set forth in Section 3 hereof, and in the event the expulsion is not for cause by reason of dishonesty, unethical conduct or other acts of moral turpitude of such partner, then, and in such events, he shall be entitled to the same rights and payments, subject to the same terms and conditions, as if he had retired and had not been expelled."

The 1965 agreement was amended in 1968. The terms of the agreement that were modified do not change the application of the 1965 agreement to the issues raised in this appeal.

Article VII, § 3 of the agreement states specific conditions that must be met by a partner to qualify for retirement benefits. If a partner does not meet those qualifications, then that partner is not entitled to the compensation designated in Article VII, § 2(a)(iii). Plaintiff argues that the 1965 agreement violates DR 2-108(A) because an expelled partner is entitled to substantial benefits under Article VII, § 2(a)(iii) if he quits practicing law, but forfeits these benefits if he resumes practice. The benefits at issue here involved approximately $190,000.

Plaintiff argues first that the terms of the 1965 agreement violate DR 2-108(A) because payment of one year of partnership profits is conditioned upon a former partner's quitting the practice of law. In support of this argument, plaintiff directs this court's attention to *Gray v. Martin*, 63 Or. App. 173, 663 P.2d 1285, *rev. denied* 295 Or. 541 (1983). In *Gray*, a law firm sued a withdrawing partner to obtain an accounting of attorney fees he collected on seven contingency fee cases he took with him when he left the firm. Defendant, the withdrawing partner, argued he was entitled to keep the contingency fees because it was not practicable for him to bill his unbilled time on those cases at the time he withdrew from the firm. The law firm described the

partnership agreement as having a "nothing in - nothing out" policy. The court concluded that this policy was not consistent with a withdrawing partner's taking the files of pending partnership cases and collecting fees on those files without accounting to the continuing firm for the monies received. 63 Or. App. at 178.

The withdrawing partner counterclaimed, alleging that he was entitled to withdrawal benefits of the partnership agreement because restrictions conditioning the payment of these benefits upon his cessation of the practice of law in three counties in which the law firm was active violated DR 2-108(A). The law firm argued that the provision did not restrict the withdrawing partner's right to practice law and, even if it did, was an ethical condition to the payment of retirement benefits. 63 Or. App. at 181. The Oregon Court of Appeals concluded that the prohibition contained within the partnership agreement directly affected the withdrawing partner's right to practice law in the three counties listed because he lost benefits that otherwise would be his. The court found this restricted his right to practice law and was not a condition for the payment of retirement benefits. For the disciplinary rule to have meaning, the court reasoned that retirement must mean something different than withdrawal from the firm. Otherwise, every termination of a relationship between law partners would be a retirement and agreements restricting the right to practice would always be allowed. 63 Or. App. at 182. Plaintiff argues that this case supports his claim because his entitlement to retirement benefits is conditioned upon his ceasing the practice of law.

In further support of his argument, plaintiff relies upon two opinions by state ethical committees and one opinion by a district court in Dallas County, Texas. Plaintiff did not include copies of these opinions in the record or in his brief. We note that the issue addressed by the Kentucky Bar Association Ethics Committee was whether a clause in a partnership agreement tying a partner's right to certain payments upon his withdrawal from a firm to a covenant not to compete within a geographical area for a period of two years violates DR 2-108(A). Reasoning that not every termination of or withdrawal from a law firm can be treated as a retirement, the committee concluded that offering induce-

ments or conditioning benefits upon compliance with a noncompete covenant violates DR 2-108(A), citing *Gray v. Martin.* The committee did not issue an opinion about the enforceability of such a provision because it involved a question of law and was likely to be the subject of litigation. Nat'l Rptr. on Legal Ethics n.2, Ky. Op., p. 13 (1988).

The agreement here is distinguishable from that in *Gray* and in the Kentucky ethics committee opinion. Under the 1965 Foulston-Siefkin agreement, one must meet one of the three conditions of Article VII, § 3 to be entitled to receive retirement benefits. Plaintiff qualified under two of these provisions because (a) he was over 60 years of age, and (b) he had been associated with Foulston-Siefkin for more than 30 years. Although eligible to receive retirement benefits, he became entitled to receive them only if he stopped practicing law. This provision fits squarely within the exception of DR 2-108(A).

In addition, plaintiff argues that the restrictions in the 1965 agreement are unethical and unenforceable on their face because the retirement benefits are not restricted to retirement only, as required by DR 2-108, but, under the terms of the agreement, are available as well to those who are expelled.

We find no merit in plaintiff's argument. Expelled partners and retired partners are not treated the same under the agreement. Under Article VII, § 5, the agreement allows an expelled partner to be treated as if that partner retired, but only if the expelled partner qualifies under one of the three provisions of Article VII, § 3. To qualify, the expelled partner must be 60 years of age, have been with the firm at least 30 years, or be unable to continue practicing law because of a permanent physical or mental disability. Only expelled partners who fit these qualifications are entitled to receive the additional compensation provided to retiring partners. Once an expelled partner is determined to be eligible for retirement benefits, the firm then treats the expelled partner as if he had retired. To be retired, the provisions outlining the requirements for retirement impose upon the retiring or expelled partner the condition to not practice law. If a retired partner, or an expelled partner who qualifies for retirement benefits, does practice law, then, under the agreement's retirement

provisions, retirement benefits cease and any amounts previously paid must be returned.

DR 2-108(A) allows restriction of the practice of law if it is a condition to payment of retirement benefits. The provisions of the 1965 agreement, which outline the requirements for one to be retired and condition the payment of retirement benefits upon the retiring partner's continuing cessation of the practice of law, come within the exception set forth in DR 2-108. The terms of the provisions of the 1965 agreement do not violate the Code of Professional Responsibility. The agreement conditions the payment of retirement benefits upon the retiring partner's withdrawal from the practice of law. The agreement offers the same retirement benefit payments to an expelled partner who qualifies for retirement. This case is distinguishable from the facts in *Gray* and the case before the Kentucky ethics committee because the expelled partner must meet specific conditions of retirement to qualify for the payment of these benefits. The failure to meet these conditions makes one ineligible for the retirement benefits. Therefore, we conclude the trial court was correct in finding that the provisions of the 1965 agreement do not violate DR 2-108(A).

We next turn to plaintiff's argument that the attempt by Foulston-Siefkin to apply the terms of the 1965 agreement make the agreement void and unenforceable. According to plaintiff, Foulston-Siefkin offered to pay him $190,416.89 if he would quit practicing law in Kansas, but if he continued to practice, the entire amount would be forfeited. Plaintiff argues that this amount was offered to coerce or induce him to stop practicing law. Plaintiff argues this offer was against public policy, making the partnership agreement unenforceable as it was used in his case.

In support of his argument, plaintiff once again relies upon *Gray v. Martin*. In *Gray*, the agreement prohibited the withdrawing partner from practicing law in three counties as a condition of receiving the designated compensation after withdrawing from the firm. Nothing in the agreement distinguished an expelled or withdrawing partner from a retiring partner. To show the close parallel between his case and *Gray*, plaintiff points to the restrictions Foulston-Siefkin suggested on his practice of law if plaintiff wanted to retain and continue to receive retirement benefits from the firm. These conditions appear in a letter dated

November 16, 1983, to plaintiff from Robert N. Partridge, a partner in Foulston-Siefkin. The letter indicates the parties are attempting to settle the issues concerning plaintiff's departure from the law firm and addresses plaintiff's desire to continue certain activities without forfeiting retirement benefits. In an effort to accommodate plaintiff, Partridge sets forth "certain permitted activities in which [plaintiff] may engage which, for the purposes hereof only, will not constitute the practice of [law] or employment in an occupation associated with or related to the practice of law." The permitted activities were described as follows:

"You may rent office space and employ a secretary, with the understanding that you will identify and utilize it as a 'private office' and not a law office. You agree that you will not list or advertise yourself by stationery, letterhead, building address, telephone listing, or otherwise as a lawyer or attorney. Within that setting you may consult with persons and counsel them, but you may not represent them in judicial or administrative proceedings. If you refer such persons to other lawyers, you will either make no charge for any service rendered by you either before or after the referral or you agree that it shall not be your practice to make such referrals to any particular lawyer or law firm."

If plaintiff accepted these permitted activities, then the law firm agreed to compensate him at the rate of $2,000 a month for 96 months under the terms of the partnership agreement.

Plaintiff argues that compliance with the restrictions proposed by Foulston-Siefkin prevents him from practicing law. Plaintiff is correct. Plaintiff, however, is not prevented from practicing law. He needs to comply with these restrictions only if he wants to receive retirement benefits under this 1965 agreement.

Both parties discuss the case of *Cohen v. Lord, Day & Lord*, 144 App. Div. 2d 277, 280, 534 N.Y.S.2d 161 (1988), which was reversed during the pendency of this appeal by the New York Court of Appeals on December 19, 1989. *Cohen v. Lord, Day & Lord*, 75 N.Y.2d 95, 551 N.Y.S.2d 157 (1989). A partner who voluntarily withdrew from a law firm challenged the partnership agreement which conditioned payment of money upon a withdrawing partner's obligation to refrain from practicing law in any state or other jurisdiction in which the partnership maintained an office, or in a contiguous jurisdiction, as an unlawful and unreasonable restriction upon the right to practice law in conflict

with DR 2-108(A). Although the Appellate Division concluded that the conditional payment did not violate DR 2-108(A), but was merely a financial disincentive to keep withdrawing partners from competing with the firm, the Court of Appeals disagreed and reversed. The forfeiture-for-competition clause of the partnership agreement provided:

"Notwithstanding anything in this Article . . . to the contrary, if a Partner withdraws from the Partnership and without the prior written consent of the Executive Committee continues to practice law in any state or other jurisdiction in which the Partnership maintains an office or any contiguous jurisdiction, either as a lawyer in private practice or as a counsel employed by a business firm, he shall have no further interest in and there shall be paid to him no proportion of the net profits of the Partnership collected thereafter, whether for services rendered before or after his withdrawal. There shall be paid to him only his withdrawable credit balance on the books of the Partnership at the date of his withdrawal, together with the amount of his capital account, and the Partnership shall have no further obligation to him (emphasis added)." 75 N.Y.2d at 97.

The New York Court of Appeals held that the significant monetary penalty exacted by this provision constituted an impermissible restriction on the practice of law, in violation of DR 2-108(A), and was against public policy. The court concluded that the forfeiture-for-competition provision "would functionally and realistically discourage and foreclose a withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel." 75 N.Y.2d at 98. In *Cohen*, the retirement benefits were dealt with in a separate provision of the agreement. Unlike departure compensation that had to be completed within three years, retirement benefits extended to death of the retiring partner and might even continue to the partner's surviving spouse. The New York Court of Appeals concluded that an agreement that restricts a withdrawing partner's ability to practice law violates DR 2-108(A) and is unenforceable as against public policy. 75 N.Y.2d at 101. No such restriction exists in the present case.

The cases cited by plaintiff are distinguishable from the present case. The plaintiffs in *Gray* and in *Cohen* both voluntarily withdrew from the firm. No agreement was made that either plaintiff qualified for retirement benefits. The question here is whether conditioning the payment of retirement benefits upon the part-

ner's voluntary cessation of the practice of law violates public policy. That question was not before the court in *Gray* or *Cohen.* Here, Foulston-Siefkin offered to pay $190,419.89 in retirement benefits if plaintiff quit practicing law in competition with Foulston-Siefkin. This offer was based upon the 1965 agreement. DR 2-108(A) states that the right of a lawyer to practice law after terminating a relationship created by a partnership or employment agreement with another attorney can be restricted as a condition to the payment of retirement benefits. If this is to have meaning, requiring forfeiture of the retirement benefits if the practice of law resumes will not violate DR 2-108(A). Nor was the offer of retirement benefits here coercive. Plaintiff did not voluntarily withdraw from Foulston-Siefkin. He was forced to leave under threat of being expelled. Because of his longevity with the firm, he qualified to receive retirement benefits. To receive these benefits, however, plaintiff had to meet certain conditions. Plaintiff had to choose between retiring, including stopping the practice of law and receiving over $190,000 in retirement benefits, or continuing the practice of law, in which case he lost retirement benefits. The provisions of the 1965 agreement making the payment of retirement benefits conditional upon plaintiff's retirement by not continuing to practice law was not unethical or unenforceable and did not violate DR 2-108(A).

Finally, plaintiff argues that, because the conditional payment of the retirement benefits is an unethical and unenforceable restraint on the continued practice of law, the entire 1965 agreement is unethical and unenforceable. Because the 1965 agreement contains no severability clause and the conditional payment of retirement benefits is unlawful, plaintiff argues that the entire agreement is void. The retirement provisions, however, do not violate DR 2-108(A) or public policy. The contract is not illegal or void.

Even if the provisions relating to retirement benefits were illegal, they are easily severable from the rest of the contract. A contract that contains valid and invalid provisions in which the lawful provisions can be easily severed will be upheld as to the lawful portion. *Henshaw v. Smith*, 102 Kan. 599, Syl. ¶ 1, 171 Pac. 616 (1918). As a general rule, if possible, a court should sustain the legality of contracts in whole or in part when they

are fairly entered into by the parties. The court should not seek loopholes and technical grounds for defeating the intended purpose of the contract but, instead, public policy encourages the freedom to contract, which should not be interfered with lightly. *Foltz v. Struxness*, 168 Kan. 714, 721-22, 215 P.2d 133 (1950).

Plaintiff's attempt to have the 1965 agreement declared void and unenforceable in its entirety is related to plaintiff's argument that he should receive a portion of the attorney fees collected in the helium litigation cases. Under the terms of the agreement, any partner who leaves the firm as a result of death, retirement, withdrawal, or expulsion ceases to have any interest in the partnership except as expressly provided in the agreement. In particular, Article VII, § 1 provides:

"[N]o such deceased, retiring, withdrawing or expelled partner, or his beneficiaries . . . shall have any claim of any nature or kind against the remaining partners or against the partnership including, but not limited to, any claims for work in process or uncollected fees, it being the intention hereof to limit such deceased, retiring, withdrawing or expelled partner's rights only to such rights as are expressly provided in this ARTICLE VII and in ARTICLE II relating to the firm name."

The trial court did not address the enforceability of this provision but, instead, dismissed the plaintiff's claims as being time barred. Our finding that the 1965 partnership agreement is enforceable would preclude plaintiff's claim for attorney fees acquired by the firm after he left. Plaintiff attempts to avoid the above provision by the ten claims set out in his amended petition. Several of these claims are based upon alleged oral agreements or conduct that supplemented or modified the 1965 agreement.

The oral agreements or conduct supplementing or modifying the 1965 agreement allegedly occurred prior to plaintiff's leaving the firm. The cause of action based upon such an agreement or conduct would have accrued at the time the plaintiff left the firm on January 1, 1983. Since the case was not filed within three years of that date, the trial court correctly held these claims were time barred pursuant to K.S.A. 60-512.

The balance of plaintiff's claims are based upon wrongful discharge, fraud, breach of a fiduciary duty, and quantum meruit. Some of these claims are very broadly worded and include several allegations, some of which we need not specifically address due

to our holding herein that the 1965 partnership agreement is valid and enforceable.

Both parties agree that the two-year statute of limitations contained at K.S.A. 1989 Supp. 60-513(a) applies to plaintiff's claim that he was wrongfully discharged. Plaintiff argues that substantial injury in this case did not occur until he became aware that Foulston-Siefkin had actually filed for and received extraordinary fees in the helium litigation. According to plaintiff, this occurred in December 1985. Defendants argue that any entitlement plaintiff had to attorney fees from the helium litigation cases existed when plaintiff left the firm on January 1, 1983. Defendants point out that the 1965 agreement did not allow plaintiff to recover for fees received after he left the firm even though work was in progress at the time of his departure. Defendants argue that plaintiff should have filed suit within two years of leaving the firm, or by January 1985.

Plaintiff obviously was fully aware of the complexity of those cases. As one of the most senior partners in the law firm, he was acquainted with those cases and even argues that he was intimately involved in their litigation. Although plaintiff would not have known at the time he was expelled from Foulston-Siefkin of the amount of attorney fees that would ultimately be recovered by the firm, plaintiff was fully aware of the potential for recovery. In fact, plaintiff asserts that he urged Foulston-Siefkin to seek extraordinary fees just prior to his leaving the law firm. Although he did not know the amount of fees that would be recovered, he would have been aware of sufficient ascertainable injury to justify an action for recovery of damages at the time he now alleges that he was wrongfully expelled. Therefore, the two-year statute of limitations under K.S.A. 1989 Supp. 60-513(a) accrued at the time he left the firm. He officially ceased being a partner in the firm on January 1, 1983, although he remained "of counsel" until February 28, 1983. In any event, this action was not filed until November 1987, long after the two-year statute of limitations had run. The trial court was correct in dismissing plaintiff's claim because it was barred by the statute of limitations.

Plaintiff next claims that the partnership had a fiduciary obligation to not make material misrepresentations or omissions concerning partnership affairs; specifically those involving the

partnership's intent to seek extraordinary fees in the helium cases. Plaintiff alleges that the partnership breached this fiduciary duty by misrepresenting to plaintiff that it did not intend to seek attorney fees in the helium cases and by failing to disclose that it was attempting to obtain those fees simultaneously with its efforts to expel plaintiff. Plaintiff alleges that the two-year statute of limitations contained in K.S.A. 1989 Supp. 60-513(a)(3) applies and that this cause of action was filed in a timely manner because it did not accrue until the fraud was discovered. Plaintiff asserts that he first became aware of recovery of attorney fees in the helium cases in December 1985, and, because this action was filed in November 1987, it was timely.

Defendants agree that this claim is controlled by the two-year statute of limitations contained at K.S.A. 1989 Supp. 60-513(a)(3), but argue the cause of action accrued at the time plaintiff left the firm because plaintiff knew or could have easily discovered the facts involving this claim when he departed on January 1, 1983.

Although the trial court, in dismissing these claims, did not specifically deal with each of the ten claims filed by plaintiff, it did specifically find as follows:

"Miller's status in the firm allowed him to know about the 1965 agreement and other firm business including the potential that the helium litigation could produce some large but highly delayed firm income. The parties do not claim any pending [litigation] tolled the applicable statutes or any personal incompetencies. Miller's claim that he did not know the substantial nature of the effect of the 1965 agreement is not supported by the facts of this case even though the exact amount of any helium fees were not generally known in late 1982 by Miller or any party. There is no tolling or extension of time applicable to this case."

"Under Kansas law, a fraud is discovered at the time of actual discovery or when, with reasonable diligence, the fraud could have been discovered." *Waite v. Adler*, 239 Kan. 1, 6, 716 P.2d 524 (1986). Although plaintiff argues that he did not actually discover that Foulston-Siefkin was seeking and receiving attorney fees until December 1985, with reasonable diligence he could have determined this much earlier. Although Sawatzky, the attorney in charge of the helium litigation, indicated that plaintiff was not intimately involved in these cases when he left the firm,

plaintiff was certainly aware of the ongoing litigation. A statement regarding attorney fees and litigation costs was filed in the United States District Court for the District of Kansas in the helium cases on December 1, 1982. With the exercise of reasonable diligence, plaintiff could have learned of this filing. Although he may not have been aware of the extent of the fees recovered by the firm until December 1985, he was certainly aware of the potential for recovery of such fees. Any statements made by the firm that could be termed a misrepresentation or any facts that could be regarded as concealed by the firm could have been easily discovered by plaintiff with the exercise of reasonable diligence. Therefore, this cause of action, which was not brought within two years of plaintiff's expulsion on January 1, 1983, is time barred.

Plaintiff also claims that a fiduciary duty was owed to him by the partnership and by the executive committee of the partnership, which was violated when it made misrepresentations and omissions concerning the efforts of Foulston-Siefkin to receive compensation for additional attorney fees in the helium litigation cases. This claim relates specifically to the conduct by the executive committee. It also contains a claim that the statements made by the committee regarding the need to expel plaintiff were defamatory because the committee knew the statements were false. Plaintiff argues that these claims are controlled by the two-year statute of limitations of K.S.A. 1989 Supp. 60-513(a)(3) regarding fraud.

Defendants note that, although this claim is labeled defamation and breach of fiduciary duty by the executive committee, the allegations relate only to defamation. Defendants argue that this claim would be covered by the one-year statute of limitations of K.S.A. 60-514, which was clearly not met with the filing of this action in November 1987.

Whether this claim is viewed as merely an allegation of defamation or to also include a charge of breach of fiduciary duty, it was not brought within the applicable statute of limitations period. Clearly the claim was not brought within the one-year limitation for defamation under K.S.A. 60-514. Furthermore, it was not filed within the two-year limitation of K.S.A. 1989 Supp. 60-513(a)(3). Although the firm did not begin to actually receive

fees on the helium cases until December 1985, plaintiff was aware of the possible recovery of such fees, but he did not know the amount that would be involved. Furthermore, through the exercise of reasonable diligence, plaintiff could have learned of the application by the law firm for fees. Because plaintiff was aware that this was possible and that it was time to pursue such a recovery at the time he left the firm, the cause of action accrued with his departure on January 1, 1983. The trial court did not err in concluding that this claim was barred by the statute of limitations.

Plaintiff finally argues that Foulston-Siefkin cannot use the statute of limitations as a defense to his claims because the firm misrepresented to plaintiff that it would not seek additional attorney fees in the helium litigation. As a result of the misrepresentation, plaintiff contends he left the firm without any opportunity to claim a share of the helium fees "either through the partnership processes or through litigation." Plaintiff further alleges that Foulston-Siefkin is estopped from claiming the statute of limitations as a defense because once it requested those fees, Foulston-Siefkin never informed plaintiff that the fees were being sought. Due to our finding that the partnership agreement is enforceable, our discussion of this issue is limited to events which occurred prior to plaintiff's leaving the firm.

In support of his claim, plaintiff relies on the case of *Newton v. Hornblower, Inc.*, 224 Kan. 506, 582 P.2d 1136 (1978). In *Newton*, a director of a corporation began a shareholder's derivative action against his codirectors for misappropriation of corporate assets and excessive management salaries. When defendants attempted to assert the statute of limitations, the court did not let them take advantage of limitations when their concealment was the basis of the delay in filing the action. The court emphasized the fiduciary duty of officers and directors of corporations, noting that Kansas sets a higher standard or stricter fiduciary duty for directors and officers of corporations than some jurisdictions. Thus, Kansas imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders. This duty requires the officer or director to work for the general interests of the corporation. 224 Kan. at 514.

Plaintiff also relies upon the discussion by this court regarding the applicability of fraudulent concealment in *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 (1980). The university sued a manufacturer of roofing materials because the roof on the university's new library building leaked repeatedly. The roof was completed in 1969, began leaking in 1970 or 1971, and continued to leak during virtually every rain thereafter. The university repeatedly demanded that the roof be repaired. In April 1975, an expert retained by the university concluded that the entire structure had to be reroofed. The university argued that the failure of the manufacturer to disclose its problems with other roofs constituted fraudulent concealment that tolled the statute of limitations. The court rejected this argument, concluding that no concealment occurred that would toll the running of the statute of limitations when the cause of action is known to the plaintiff or where knowledge is presumed. Plaintiff relies upon the following language by the court to support his argument:

" 'There can be no concealment which will prevent the running of the statute of limitations where the cause of action is known to the plaintiff or there is a presumption of such knowledge. *Where the defendant does not occupy a fiduciary or confidential relationship toward the plaintiff,* neither affirmative nor passive conduct of the defendant will constitute such a concealment as to prevent the running of the statute of limitations, where through reasonable diligence on his part he could have learned of the existence of his cause of action. It has accordingly been held that the party seeking to toll the statute of limitations must explain why due diligence did not lead or could not have led to discovery of the facts and the cause of action.' " (Emphasis added.) 227 Kan. at 564 (quoting 51 Am. Jur. 2d, Limitation of Actions § 148, pp. 720-21).

Plaintiff argues that this decision in *Friends University* reestablishes that estoppel by fraudulent concealment as discussed in *Newton* applies to a fiduciary relationship.

As further support for his argument, plaintiff argues two tort cases from California and a third case from a federal district court in Virginia. All three cases involve misrepresentations made by doctors associated with respective defendants whose advice caused the plaintiffs to delay recognizing the extent of injury that resulted from the defendants' negligence. In each case, the respective court found that the defendant would not be allowed to use the statute of limitations to bar the claim by plaintiff when defendant's

conduct caused the plaintiff to delay in filing the suit. *Mumpower v. Southern Railway Company*, 270 F. Supp. 318 (W.D. Va. 1967); *Pashley v. Pacific Elec. Ry. Co.*, 25 Cal. 2d 226, 153 P.2d 325 (1944); *Bowman v. McPheeters*, 77 Cal. App. 2d 795, 176 P.2d 745 (1947). Plaintiff cites additional cases from several jurisdictions that support his argument that Foulston-Siefkin should not be allowed to assert the statute of limitations bar because, by doing so, Foulston-Siefkin would be allowed to take advantage of its own fraud, concealment, and misrepresentation to the plaintiff.

In response to plaintiff's argument, defendants agree that, in Kansas, one who makes representations that lull another party into a false sense of security or cause the injured party to not pursue a claim and thus allow the statute of limitations to lapse will be estopped in later attempting to plead the statute of limitations as a bar when the injured party files suit. The defendants, however, deny that this occurred in the instant case.

Plaintiff's reliance upon our decisions in the *Newton* and *Friends* cases is misplaced. In addition, the California and Virginia cases are factually distinguishable from the present case. There is no similarity between the plaintiffs' situations in those cases and that of the plaintiff here. In *Bowen v. Westerhaus*, 224 Kan. 42, 578 P.2d 1102 (1978), this court noted that the doctrine of equitable estoppel is based upon the principle that a person is held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances, has in good faith relied thereon. 224 Kan. at 45-46. See *Coffey v. Stephens*, 3 Kan. App. 2d 596, 597, 599 P.2d 310 (1979). In *Bowen*, this court summarized the principles surrounding the doctrine of equitable estoppel as follows:

" 'The doctrine of equitable estoppel requires consistency of conduct, and a litigant is estopped and precluded from maintaining an attitude with reference to a transaction involved wholly inconsistent with his previous acts and business connection with such transaction.' (*Browning v. Lefevre*, 191 Kan. 397, Syl. ¶ 2, 381 P.2d 524 [1963].)

" '. . . One who asserts an estoppel must show some change in position in reliance on the adversary's misleading statement. . . .' (*In re Morgan*, 219 Kan. 136, 137, 546 P.2d 1394 [1976].)

" '. . . Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. . . .' (*United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 527, 561 P.2d 792 [1977].)" 224 Kan. at 46.

Even assuming that the facts are as alleged by plaintiff, nothing suggests why the exercise of due diligence by the plaintiff did not lead or could not have led to the discovery of the efforts by Foulston-Siefkin to obtain attorney fees in the helium cases. Plaintiff admits that he encouraged the law firm to seek these fees just prior to their efforts to have him expelled from the firm. At the time plaintiff left Foulston-Siefkin, he was a senior partner. Aside from the one conversation with Sawatzky, plaintiff makes no indication that he made additional inquiries concerning the possibility of obtaining fees in the helium cases. Plaintiff asserts liability by Foulston-Siefkin without assuming any responsibility for not making inquiry of his own. The trial court found that the facts of the case did not support plaintiff's claim that he had no knowledge of the substantial nature of the potential recovery that could be produced by the helium litigation or of the effect of the 1965 agreement upon such a recovery. As the trial court noted, even though the exact amount of the helium fees was not generally known at the time plaintiff was expelled, plaintiff was aware of the potential recovery.

The facts here are similar to the events that occurred in *Friends University*. Although Friends had not determined the exact scientific cause of the leaking roof, this did not toll the running of the statute of limitations because Friends was fully aware that a severe problem existed, yet elected to seek a nonjudicial resolution of the controversy by making repeated demands to repair the roof. Here, plaintiff was aware prior to leaving the firm of the potential recovery for attorney fees under the helium litigation. The request for attorney fees was filed with the district court and would have been easily discoverable by plaintiff, who is an experienced attorney and aware of the procedures for ob-

taining such a recovery. Any concealment that occurred here does not prevent the running of the statute of limitations because plaintiff was aware of the potential recovery of attorney fees. The fact that he did not realize the amount of recovery that was possible does not excuse his failure to exercise due diligence in attempting to determine whether such attorney fees were actually being sought. The defendants are not estopped from asserting the running of the statute of limitations.

The rules governing summary judgment are set out in K.S.A. 1989 Supp. 60-256. Summary judgment shall be granted where

"the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." K.S.A. 1989 Supp. 60-256(c).

To oppose a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact.

"When a motion for summary judgment is made and supported as provided in this section, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this section, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." K.S.A. 1989 Supp. 60-256(e).

The plaintiff here argues that material facts relied upon by the district court and by the defendants are controverted and cannot support summary judgment. We agree that many facts are disputed, but none is material to the denial of plaintiff's partial summary judgment or the entry of summary judgment in favor of the defendants.

In order to preclude summary judgment, the disputed facts must be material to the issues to be determined. In *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 605, 738 P.2d 1246 (1987), we said:

"Ruebke's claims do not raise any genuine issues of material fact. In order to preclude summary judgment, the facts subject to dispute must be material to the conclusive issues in the case. An issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A feigned or imaginary issue is not a genuine issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact,

however resolved, could not affect the judgment, it does not present a genuine issue of a material fact. *Busch v. City of Augusta*, 9 Kan. App. 2d 119, Syl. ¶¶ 4, 5, 674 P.2d 1054 (1983)."

The trial court may properly enter summary judgment where the only material questions presented are those of law. *Barber v. Williams*, 244 Kan. 318, 767 P.2d 1284 (1989).

We conclude that the district court did not err in denying partial summary judgment in favor of the plaintiff and in granting summary judgment in favor of the defendants. The judgment of the district court is affirmed.

HOLMES and HERD, JJ., not participating.