No. 46,352

Joe Lockridge, *Appellant*, v. Tweco Products, Inc., R. L. Townsend, and H. W. Beeman, *Appellees.*

(497 P. 2d 131)

Opinion filed May 6, 1972.

*Ronald W. Mayes*, of Wichita, argued the cause and was on the brief for the appellant.

*Milo M. Unruh*, of Arn, Mullins, Unruh and Kuhn of Wichita, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

Foth, C.: This is a trade secret case in which the sole issue on appeal is whether plaintiff's action was barred by the statute of limitations. The trial court held that it was so barred and dismissed the case at the close of plaintiff's evidence. Plaintiff appeals.

Plaintiff is a welder. The corporate defendant is engaged in the manufacture of welding equipment, tools and supplies, and the individual defendants are its managing officers. On April 23, 1962, plaintiff wrote to defendants saying he had invented a "rotary ground clamp" which was a great improvement over any then on the market. He pointed out its virtues and said he was enclosing a photograph of his working model. (Defendants deny receiving the photograph, but that question is immaterial to the issue before this court.)

A "ground clamp" is a device for holding an electrical ground wire in solid contact with metal being welded so as to complete the circuit necessary for arc welding. A "rotary" ground clamp is one designed for use on work which is turned or rotated during welding, such as pipe or cylindrical tanks or drums. Essential features are firm contacts, both internally and with the work, to prevent arcing, and a swivel device to keep the ground wire from twisting as the work is rotated. Plaintiff accomplished these ends by using a conventional C-clamp for contact with the work and a copper-sleeved ball bearing on a bolt, welded to the C-clamp, for a swivel contact with the ground wire.

On May 9, 1962, defendants responded to plaintiff's letter, stating that they then had no such product in their line, expressing tentative interest, and suggesting he send a sample. Plaintiff promptly complied. On May 24, 1962, defendants returned plaintiff's working model with the comment that it appeared adaptable for low amperage work, but that their interest in and the chief use of a rotary ground was for high amperage welding with automatic equipment.

Plaintiff heard no more, but seven years later, in May, 1969, he discovered in a Tweco catalogue devices offered for sale which appeared to him to be based on his idea. On June 2, 1969, he instituted this lawsuit, alleging the background recited above and:

"III

"THAT the plaintiff in good faith disclosed in confidence his rotary ground clamp to the defendants as a potential new product for manufacture and/or marketing by the defendants where the plaintiff was obviously expecting to share in the profits of the defendants and/or to be in reasonable manner rewarded for bringing his rotary clamp to the attention of the defendants, the reward to be negotiated between the interested parties prior to the manufacture, marketing, and/or disclosure of the plaintiff's rotary clamp outside of the defendant Tweco Products, Inc. company. It was not the intention of the plaintiff that anyone make, use and/or sell or otherwise disclose his rotary ground clamp outside the said company without his consent, and/or without adequately compensating him for the right to do so.

"IV

"THAT the defendants on or about March 1, 1968, made public for the purpose of marketing the same general rotary ground clamp disclosed by the plaintiff to them on or about April and/or May, 1962, without the plaintiff's consent, without compensating the plaintiff for his contribution in this matter, and/or without his general knowledge and consequently to the damage of the plaintiff for the defendants' joint and/or several breach of implied contract and therefore committed a tort against the plaintiff whereby they have been jointly and/or severally unjustly enriched at the expense of the plaintiff."

The prayer was for a temporary and permanent injunction against further use or disclosure of plaintiff's idea, money damages for defendants' allegedly tortious acts, an accounting, and treble damages.

Defendants raised the statute of limitations defense by various pre-trial motions, in their amended answer, and by motion to dismiss at the close of plaintiff's case, upon trial to the court without a jury. After taking the latter motion under advisement the court concluded that plaintiff had the burden of proof on the issue and permitted him to reopen his case for further evidence. After plaintiff again rested the court sustained the motion to dismiss, making the following findings:

"(a) This action was commenced on June 2, 1969;

"(b) The Statutes of Limitations controlling this action are K. S. A. 60-510 and sub-section (4) and the last full unnumbered paragraph of K. S. A. 60-513;

(c) Plaintiff's evidence showed conclusively that the acts which plaintiff claims caused him substantial injury occurred, if at all, more than two years prior to the commencement of this action;

"(d) The 'fact of injury', as that term is used in the last full unnumbered paragraph of K. S. A. 60-513 (if any for which defendants would be liable to plaintiff), was, as shown by plaintiff's evidence, reasonably ascertainable to plaintiff more than two years prior to the commencement of this action.

"Therefore, the Court concludes that defendants' motion to dismiss should be granted and sustained for the reason that if plaintiff ever had a claim against the defendants upon which relief could be granted to him and against defendants, the same has been barred by the provisions of K. S. A. 60-510 and K. S. A. 60-513.

"By reason of the above findings and conclusions on the issue of the Statute of Limitations, the Court deems it unnecessary to rule on the other grounds of the motion to dismiss for the reason that they are now moot and the Court does not do so."

The evidence on which this result was based showed that defendants began manufacturing rotary ground clamps in 1963, with the earliest sales in the record being made in March, 1965. By the latter date they were being advertised in a trade journal described as the "bible of the welder's industry" and were also being shown in defendants' sales catalogue, which had wide circulation. The particular catalogue in which plaintiff first saw the devices in 1969 had been published March 1, 1966.

Plaintiff does not contest the trial court's finding that defendants' first use and disclosure of his idea were reasonably ascertainable by him more than two years prior to the filing of his action. His one point, which embraces everything in his statement of points, is summarized by him in his brief as follows:

"The misappropriation and continuing use of a trade secret is a continuing tort with respect to which the statute of limitations is not a bar, at least as to the statutory period prior to the commencement of the action. The fact that the initial misappropriation may have occurred more than two years prior to commencement of the action is immaterial. Each misappropriation and use of the trade secret by appellee thereafter constituted a new wrong that started the limitations period running anew. . . . The court below erred in not applying the rule in this case."

Defendants, on the other hand, say that if they misappropriated any secret of plaintiff's they did so more than two years before he sued, that the tort complained of occurred at that time and the statute then began to run, that nothing occurred which would toll the statute, and the action is therefore barred.

Before discussing the positions of the parties it is perhaps well to note what is *not* involved here. First, because of the basis for the dismissal, we are not concerned with whether the facts proved made out a claim for relief. For purpose of this appeal we *assume* that plaintiff's idea *was* a trade secret, that it *was* disclosed in confidence, and that defendants *did* make use of the disclosure. See *Mann v. Tatge Chemical Co., Inc.*, 201 Kan. 326, 440 P. 2d 640. Second, we are not concerned with whether the three year statute for implied contracts applies (K. S. A. 60-512). Plaintiff relies exclusively on the general, two year, "not herein enumerated," tort limitation of K. S. A. 60-513 (4), as amended. Third, we are not concerned with when the tort first caused substantial injury nor, as noted above, with when the fact of injury became reasonably ascertainable. Both are conceded to have first occurred more than two years prior to the commencement of the action.

What we are left with is the single question of whether a single cause of action arises (and the statute of limitations commences to run) when a trade secret of the nature of plaintiff's is first misappropriated, disclosed and used, or whether each use is a new tort and gives rise to a new cause of action with its own period of limitation. The parties tell us they find only two reported cases in the country directly in point—one going each way.

Plaintiff's case is *Underwater Storage, Inc. v. United States Rubber Co.*, 371 F. 2d 950 (D. C. Cir. 1966), cert. den., 386 U. S. 911, 17 L. Ed. 2d 784, 87 S. Ct. 859. The plaintiff-appellant here had developed a system for the underwater storage of strategic materials which it had divulged in confidence to certain employees of the U. S. Navy. The defendant-appellee published a detailed descrip-

tion of the system *it* developed for the Navy, which plaintiff alleged must have been wrongfully obtained from the Navy employees. A three year tort limitation obtained, and more than three years after defendant's publication plaintiff brought its suit, based on the alleged *use* of its secret within the three year period.

The Court of Appeals for the District of Columbia allowed that after diligent search neither it nor the parties could find controlling precedent, and that "It is therefore necessary in the resolution of the question to examine the nature of the tort with which we are concerned, treatment of the issue in analogous contexts, and the policy reasons underlying the competing positions of the parties." (Id., 371 F. 2d at 954.) Because that opinion encapsulizes principles of trade secret law scattered through a multitude of other cases, and because it cogently sets forth the arguments supporting the result there reached, we quote at some length (Id., at 954-955):

"The nature of a trade secret is such that, so long as it remains a secret, it is valuable property to its possessor who can exploit it commercially to his own advantage. Once the secret is published to the 'whole world,' however, it loses its protected status and becomes available to others for use and copying without fear of legal reprisal from the original possessor. Appellee argues that because the secret is destroyed upon publication, there can be no recovery by the original possessor against subsequent users since whatever exclusive rights the original possessor had in the secret *qua* secret cease to exist upon publication. Those using the secret thereafter cannot be sued for invasion of the rights of the possessor of the secret because there was no secret left to be invaded. Thus the idea of a continuing tort for use of a secret after publication is said to be alien to a trade secret case, and appellant is therefore barred from maintaining this action since the alleged misappropriation (by appellant's own admission) took place more than three years prior to the institution of this action.

"Insofar as appellee's argument extends to parties who are not misappropriators in the first instance, or possessors of the secret by virtue of learning it from the misappropriator(s) with knowledge that it was stolen, we believe this argument to have merit. However, the fault in appellee's reasoning lies in its applying as a test to its own actions the rights of appellant as against the public generally (*id est*, those who have acquired the secret after publication), instead of considering the rule which should obtain between the original possessor and the misappropriator or those who have received the secret from the misappropriator with knowledge of the wrongful appropriation. We do not believe that a misappropriator or his privies can 'baptize' their wrongful action by general publication of the secret. Nor do we believe that the fact of the destruction of the secret prevents the continued use by the misappropriator or his privies from being a continuing wrong *vis-a-vis* the original possessor of the secret. It is the continuing use of another's secret, wrongfully obtained, or used after knowledge that it has been wrongfully obtained, that

makes the tort a continuing one. Once the secret is out, the rest of the world may well have a right to copy it at will; but this should not protect the misappropriator or his privies. Their gain is ill-gotten and the passage of time or publication to the rest of the world should not serve to cleanse their hands."

Their conclusion, on admitted policy grounds, was:

". . . We believe the rule should be that in trade secret cases where the secret has been misappropriated the wrongdoer and his privies are amenable to suit for any use of the secret so long as the use has occurred within the statutory period of limitations immediately preceding the bringing of the action." (Id., at 955.)

The opposing view is reflected in defendants' case, *Monolith Portland Midwest Co. v. Kaiser Aluminum & C. Corp.*, 407 F. 2d 288 (9th Cir. 1969). Plaintiff's secret there was a device used in cement kilns which its employees revealed to defendant in conjunction with conversations about a potential licensing arrangement. A two year limitation applied to actions on contracts not in writing, and plaintiff brought its action more than two years after defendant started selling the devices. The court held that "Monolith's cause of action fully matured at the moment Kaiser first made adverse use or disclosure of the trade secret in violation of its confidential relationship." (Id., at 292.) It went on to say (pp. 292-3):

"We also reject Monolith's contention that the statute of limitations does not bar recovery because the action is upon a continuing tort. Monolith's rationale, relying primarily upon Underwater Storage, Inc. v. United States Rubber Co. (1966) 125 U. S. App. D. C. 297, 371 F. 2d 950, is that the wrong is the adverse use of the secret disclosed in confidence; each use is a new wrong, and a continuing use is a continuing wrong. Underlying this theory is the concept that a trade secret is in the nature of property, which is damaged or destroyed by the adverse use. The law of the District of Columbia enunciated in *Underwater Storage, Inc.* is not the law in California. California law is, of course, controlling. California does not treat trade secrets as if they were property. It is the relationship between the parties at the time the secret is disclosed that is protected. (Futurecraft Corp. v. Clary Corp. (1962) 205 Cal. App. 2d 279, 23 Cal. Rptr. 198.) The protected relationship, contractual or confidential, is one to which, as Mr. Justice Holmes observed, 'some rudimentary requirements of good faith' are attached. 'Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property . . ., but that the defendant stood in confidential relations with the plaintiffs. . . .' (E. I. DuPont de Nemours Powder Co. v. Masland (1917) 244 U. S. 100, 102, 37 S. Ct. 575, 576, 61 L. Ed. 1016.) The fabric of the relationship once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated. The

cause of action arises but once, and recovery for the wrong is barred within two years thereafter unless the statute has been effectively tolled."

Two cases decided since the primary duo discussed above merely exemplify the same split in reasoning. In the first, *Shatterproof Glass Corp. v. Guardian Glass Co.*, 322 F. Supp. 854 (E. D. Mich. 1970), the defendant had hired two of plaintiff's skilled workmen who, it was alleged, had taken with them secret methods of bending glass. The court relied on and quoted *Monolith*, and for its own part said (p. 869):

". . . Obviously, the misappropriation of trade secrets is not a continuing offense. The wrong occurs at the time of the improper acquisition."

In the second, *Smith v. Piper Aircraft Corporation*, 425 F. 2d 823, 826 (5th Circ. 1970), the court noted that "The authority is scant on the question of whether the misappropriation of an idea is a continuing tort, but there are analogous situations in which the courts have found a continuing tort to keep alive an action which would otherwise be barred by the statute of limitations." The court cited a patent case, a copyright case, and *Underwater Storage*. However, the court specifically declined to decide the limitation issue since it found that any tort which had occurred was committed outside of Georgia, the forum state; therefore, even if the action was not barred, the defendant was not subject to service under Georgia's long-arm statute. Neither of these cases affords any real insight into our problem.

Plaintiff urges that we accept the *Underwater Storage* rationale because, he says, we have already recognized a "property right" in a trade secret, citing *Mann v. Tatge Chemical Co., Inc.*, supra, and cases cited therein. Since we are a "property right" state, he continues, we cannot follow the California rationale of *Monolith* where it is the "confidential relationship" which is protected.

But, as Justice Holmes observed, "The word 'property' as applied to trademarks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith." *Du Pont Powder Co. v. Masland*, 244 U. S. 100, 61 L. Ed. 1016, 37 S. Ct. 575. To say that there are "property" rights in a trade secret is but a short-hand method of saying that the originator of an idea has certain rights which, under some circumstances, will be protected by the law. One of the circumstances justifying judicial intervention exists where the adverse use is made in violation of a confidential relation-

ship, and that is the circumstance recognized as actionable in *Mann v. Tatge Chemical Co., Inc.,* supra. Without the breach of confidence the plaintiff's "property right" in *Mann* would have availed him nothing, as the opinion makes clear.

Plaintiff also seeks comfort from the ultimate result in the cases involving the use by the United States during World War II of the Bofors 40 mm. anti-aircraft gun. *Aktiebolaget Bofors v. United States,* 93 F. Supp. 131 (D. C. D. C. 1950), affirmed 194 F. 2d 145 (D. C. Cir. 1951); *Aktiebolaget Bofors v. United States,* 153 F. Supp. 397 (Ct. Cl. 1957).

Bofors, a Swedish manufacturing firm, licensed the United States in 1941 to use its secret manufacturing process on what was found to be an express condition that the guns produced be used by American forces only. The condition was imposed to protect Bofors' competitive position in selling to other nations. The United States immediately began furnishing large quantities of the gun to its allies, and after a lengthy period of protest and remonstration Bofors brought an action in the District Court for the District of Columbia for the wrongful use of its trade secret. That action was dismissed for lack of jurisdiction because it was held to sound in contract rather than tort, and the court of appeals affirmed. (There were actually three district court actions, but they all met the same fate.) Bofors fared better in the Court of Claims, where the express contractual limitation noted above was found to exist. It was there held that the express contract had no durational limit and therefore Bofors could recover for any breaches which had occurred within the limitation period immediately preceding the commencement of the action. Each export was, in effect, a new breach of the original contract. The three Bofors opinions contain language generally comporting with that found in the cases we have cited on the nature of trade secrets, but their express contract basis renders them of little assistance determining the question of tort limitations.

Both parties cite by way of analogy our cases dealing with tortious injury to real property. From these cases the following principles evolve: if a trespasser digs a ditch on another's property the tort is complete; his failure to trespass again to fill the ditch does not make it a continuing tort, nor does the fact that the full extent of the damage may not be ascertainable at the time the first injury is inflicted. *K. P. Rly. Co. v. Mihlman,* 17 Kan. 224. If a man builds

a dam on his own land causing overflow onto his neighbor's, he commits a new tort with each overflow if the water level varies with the seasons, but only one if a permanent overflow and consequent appropriation exists. *Henderson v. Talbott,* 175 Kan. 615, 266 P. 2d 273, and cases cited; *Simon v. Neises,* 193 Kan. 343, 395 P. 2d 308. A sewage disposal plant may be a nuisance which is permanent, causing permanent injury to property which gives rise to but one cause of action for damages; or it may be temporary, recurring and abatable, giving rise to many causes of action. *Adams v. City of Arkansas City,* 188 Kan. 391, 362 P. 2d 829. Water pollution from an oil well may likewise have varying effects on neighboring land, with the same varying consequences as to belated actions for damages. *Lackey v. Prairie Oil & Gas Co.,* 132 Kan. 754, 297 Pac. 679. These and similar cases at best form a background against which to examine the nature of the injury done to plaintiff in this case.

Our own analysis, made in the light of all the foregoing, turns on the distinction we perceive between plaintiff's "trade secret," a tangible, visible product of manufacture of claimed novelty but unpatented—and other secrets such as customer lists, technical know-how, processes of manufacturing and secret formulae. All may be freely used by those who have come by their knowledge by fair means, but for the uninitiated the latter group requires examination, analysis and experimentation before the secret is laid bare. Use may detract from such a secret's value by exposing it to such scrutiny, but use alone does not destroy it. In contrast, a secret like plaintiff's once used, is fully exposed to all the world who care to look at a working model. Once in the public eye it has not a shielding hand nor a delicate gesture to divert the viewer's attention from its vital parts. By mere use its value as a secret is lost forever.

This distinctive feature of his secret may make a violation of plaintiff's confidence a more egregious hurt than if it had been of the more recondite nature. Nevertheless it makes his basic injury a fixed, palpable, ascertainable and nonrecurring event. Once plaintiff's rotary ground clamp was put on the market, by defendants or others, his idea lost whatever value it had, except as he might have had a contract for royalties or the like.

This feature of some trade secrets was recognized in a case cited by plaintiff, *Titcomb v. Norton Company,* 208 F. Supp. 9, 18 (D.

Conn. 1959), where the purloined secret was a segment of a grinding wheel having unique dimensions:

"Any redress for violation of confidence, if found, necessarily would be limited to a period prior to public availability of the segments, for in the absence of patent or contract protection, when a use becomes available to the public it also becomes available to one who has obtained the necessary knowledge in confidence."

A prior second circuit case was distinguished in these words:

". . . Franke v. Wiltschek, 2 Cir. 1953, 209 F. 2d 493 is a case of breach of confidence which is distinguishable upon its facts. There the formula and method of manufacture of a compressed fabric face cloth were disclosed in confidence, together with cost figures and other data obtainable only from plaintiff's books. Here the only secrets are the dimensions of the article and 'the very putting of it upon the market destroys the secret of its production.' (Schavoir v. American Re-Bonded Leather Co., 1926, 104 Conn. 472, 476, 133 Atl. 582, 583.)" (Ibid.)

In our case we have the defendants' breach of confidence, resulting in the publication of plaintiff's secret to the world at large, no later than March, 1965. At that point defendants' competitors were free to copy, produce and market an identical product with impunity.

Should the defendants then be forever barred from manufacturing a product which is in the public domain? This would be the practical result if each use by defendant is a new tort. They could not, ten years hence, initiate production of plaintiff's rotary ground clamp though thousands like it were on the market. We think this sort of disability, extending *ad infinitum*, is an unwarranted penalty for what we regard here as one transgression, however aggravated. Unlike the *Underwater Storage* court, we think that time may and does "cleanse the hands" of many a wrongdoer, at least to the extent that his moral liability may no longer be legally enforced. Even one who misappropriates and remains in adverse possession of that most sacrosanct of property, real estate, eventually passes beyond the law's reach—although every day of his continued possession and use may deeply affront the sensibilities and insult the "legal title" of the erstwhile true owner. The adverse possessor of realty, and the converter or embezzler of personalty, have the same continuing duty as that of defendants here, *i. e.*, a duty not to use that which is rightfully another's. That duty will be enforced by the courts in an action timely brought, but not thereafter.

We therefore hold that an action based on the tortious use of plaintiff's particular trade secret could only be brought within two years of the time plaintiff first could reasonably have ascertained the fact of such use. The trial court correctly held that this action was barred by the statute of limitations and its judgment is affirmed.

APPROVED BY THE COURT.

FONTRON, J., dissents.