(847 P.2d 1321)
No. 67,206

MCCAFFREE FINANCIAL CORPORATION, *Appellant,* v.
KEVIN NUNNINK, *et al., Appellees.*

Opinion filed March 5, 1993.

*John Terry Moore,* of Hinkle, Eberhart & Elkouri, of Wichita, for appellant.

*Thomas D. Kitch,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for appellees.

Before LARSON, P.J., BRAZIL, J., and NELSON E. TOBUREN, District Judge, assigned.

LARSON, J.: This appeal arises from an action brought by McCaffree Financial Corporation, the successor company to Columbian Title and Trust Company (Columbian Title) against Kevin Nunnink, Mark Meyerdirk, Pat O'Rourke, O'Rourke Title Company, David Herd, Kathy O'Mara, Lawyers Title Insurance Corporation (Lawyers Title), and Thomas Kitch in the District Court of Johnson County, Kansas, to recover damages for the misappropriation of a portion of its title plant.

Columbian Title appeals the trial court's determination that its claims of breach of fiduciary duty, unjust enrichment, and tortious conversion were barred by the doctrine of res judicata and that its claim brought pursuant to the Kansas Uniform Trade Secrets Act (KUTSA), K.S.A. 60-3320 *et seq.,* was time barred. The defendants cross-appeal, contending Columbian Title has properly perfected its appeal only as to defendant Nunnink and Columbian Title's KUTSA claim is also barred by the doctrine of res judicata.

Columbian Title began doing business in 1920, providing abstract, title insurance, and trust services in Topeka, Kansas. In 1977, after acquiring a title plant in Sedgwick County from Lawyers Title pursuant to an exchange agreement, Columbian Title opened an office in Wichita, Kansas, and commenced doing business in the Sedgwick County marketing area.

A title plant is an index or specific compilation of the documentation describing transactions involving real property in a given county or market area. It is compiled and indexed on a daily basis from the public records relating to all real estate transactions filed with the Register of Deeds' office and other county offices in the county in which the title plant is to be used.

In Sedgwick County, a title plant consists of an indexing of such public records as documents filed in the Register of Deeds'

office (*e.g.*, mortgages, deeds and covenants); cases filed in the Sedgwick County District Court and domestic and probate courts; and cases filed in the United States District Court relating to various real estate additions, blocks, and numerical lots and other legally descriptive units in Sedgwick County.

When a title policy or abstract is ordered on a specific piece of real property in Sedgwick County, a title company can access its title plant and, by using the indexing system, is able to trace the complete history of all the transactions relating to all or a portion of the particular parcel of real estate from the date the parcel was originally patented by the United States in the late 1800's through the present time period.

The alternative to using a title plant involves searching through the grantor/grantee alphabetical index books kept at the Sedgwick County Register of Deeds' office in the courthouse. All documents relating to real estate transactions filed with the Register of Deeds' office are indexed and arranged by date in these two sets of books. A search would consist of looking manually through the relevant grantee or grantor names contained in the index books, then determining if each particular grantee or grantor transaction involved all or a portion of the real estate parcel in question. Further, the same determination would have to be made regarding all cases filed in the various district and federal courts.

Columbian Title's title plant consists of computerized title records from part of 1977-1978 through the present, and the title plant that was obtained from Lawyers Title in 1977, which consists of the Black Books and Tub Sheets. The Black Books are microfilmed and jacketed copies of the original set of index books used by Lawyers Title in Sedgwick County dating from the late 1800's to 1960. The Tub Sheets are microfilmed copies of the original index sheets used by Lawyers Title in Sedgwick County dating from 1960 through 1977-1978.

Columbian Title hired O'Rourke as an executive officer to promote and manage the Wichita office. Meyerdirk served as manager for Columbian Title's Jackson County, Missouri, title office from 1981 until September 1983.

On January 8, 1984, Columbian Title terminated O'Rourke. In 1987, O'Rourke, Meyerdirk, and Nunnink formed O'Rourke Title Company. On April 1, 1987, O'Rourke Title Company com-

menced business in Sedgwick County. O'Rourke Title Company hired several former employees of Columbian Title, including Herd and O'Mara, who were knowledgeable about and had access to Columbian Title's title plant during their employment with Columbian Title.

O'Rourke Title Company entered into an agreement with Fidelity Title Company, Inc., (Fidelity) to purchase a 10-year title record chain from 1977 through 1987. By the end of June 1987, O'Rourke Title Company ceased purchasing title record chains from Fidelity and entered into a contract for a 10-year title record chain with Security Abstract and Title Company, Inc. (Security). This 10-year chain of title was not, in and of itself, sufficient to allow O'Rourke Title Company to perform complete title work.

In April 1987, Columbian Title representatives John Dozier, Richard Schodorf, Greg Dale, and Carl McCaffree began to believe that O'Rourke had possession of a copy of a portion of Columbian Title's title plant. They knew it was not practical to operate from only a 10-year chain of title. They knew that possession of Columbian Title's microfilmed title plant through 1978, coupled with Security's 1977 to 1987 records, would enable O'Rourke Title Company to complete its title search work.

Sometime in 1987, Dozier and Schodorf discussed their suspicions with Columbian Title's and O'Rourke Title Company's competitors. In September or October of 1987, Columbian Title employees who worked at the Sedgwick County Courthouse told Schodorf that O'Rourke Title Company employees were not at the courthouse on a regular basis. Schodorf asked Columbian Title employee Kathy Breault to follow the O'Rourke Title Company employees around the courthouse to determine what information they were gathering.

Although Breault was not at the courthouse all the time, when she was present she observed that O'Rourke Title Company employees only checked the same information as employees of companies that had complete title plants. At this point, Schodorf did not believe he had enough information to form an opinion as to the source of O'Rourke Title Company's title work, so he devised a plan to investigate and obtain that information. Schodorf discussed with Dale the possible methods available to ascertain

whether O'Rourke Title Company employees were using the courthouse records and to what extent they were doing so.

Dale was directed by Columbian Title's counsel, Terry Moore, to locate specific tracts of real estate that had either no activity within the previous 10 years or that had experienced activity within the last 10 years, but would require an examination of a period of time greater than 10 years in order to develop a transfer of title or to certify a title.

Columbian Title caused six orders to be placed with O'Rourke Title Company, which Schodorf believed requested sufficiently definite information to determine whether O'Rourke Title Company had Columbian Title's title plant. Columbian Title hired a Wichita private investigator, Emery Goad, to observe the activities of O'Rourke Title Company employees at the courthouse and determine whether they were gathering information from courthouse records to be included in the contrived orders. After Columbian Title placed the orders with O'Rourke Title Company, neither Goad nor the Columbian Title employees who assisted him observed any O'Rourke Title Company employees examine records at the courthouse that needed to be reviewed in order to fill the six title orders.

O'Rourke Title Company issued title commitments for the orders that had been placed by Columbian Title. As a result of the investigation, Dale informed Schodorf "that we had gotten what we had anticipated getting."

After receiving the title commitments from O'Rourke Title Company, Columbian Title representatives met on two occasions with representatives of Security to verify that O'Rourke Title Company had not purchased from Security the information contained in the title commitments that was beyond the 10-year search. Columbian Title's representatives had similar conversations with representatives of the other title companies doing business in Wichita. Security and the other title companies denied giving title information to O'Rourke Title Company beyond the 10-year search. Schodorf told Jeff Otto of Lawyers Title that the investigation seemed to bear out the suspicions that O'Rourke Title Company had a copy of Columbian Title's Tub Sheets.

On November 24, 1987, Schodorf, Dozier, and Dale confronted O'Rourke in his office and questioned him regarding whether he

had Columbian Title's title plant. During the meeting, O'Rourke denied any wrongdoing.

On December 8, 1987, Columbian Title's counsel wrote a letter to O'Rourke, which stated in part:

"We represent Columbian National Title Insurance Company in the above-captioned matter which concerns claims regarding the misappropriation and use of certain confidential information and/or trade secrets we have reason to believe was wrongfully obtained by you and/or your employees as a result of your/their previous employment with Columbian. In particular, we believe you have wrongfully obtained from our client, without its authority or permission, a copy of the title plant jointly owned by Columbian and Lawyers Title Company and have been using these confidential records and information in direct competition with both Columbian and Lawyers Title since you and your partners went into business in Wichita under the name of O'Rourke Title Company.

"We are authorized to initiate litigation demanding a temporary and permanent injunction against you, your partners, and your company as well as a complete financial accounting of your company's business activities and actual and punitive damages against all of you for such wrongful conduct.

"A thorough investigation has already been conducted by us concerning the aforementioned claims, and although we are confident that investigation substantially proves our contentions, this letter is a serious and sincere effort on our part to give you and your partners the opportunity to show us that you are obtaining all of the necessary information to do title searches, reports, and/or write title certificates of insurance from legitimate sources without wrongfully using the information gleaned from our client's legally protected title plant."

On December 18, 1987, O'Rourke Title Company's counsel, Thomas Kitch, responded to the foregoing letter, stating in part:

"I have discussed your letter of December 8 with Mr. O'Rourke in some detail. He assures me that neither he nor any other representative of his company is utilizing any portion of the title plant owned by Columbian Title in any way in their business."

In December 1987 and January 1988, the parties attempted to negotiate a settlement of their dispute, which would have included the purchase of a copy of Columbian Title's title plant by O'Rourke Title Company. These negotiations ultimately broke down and on January 28, 1988, Columbian Title and Lawyers Title filed suit against O'Rourke, Meyerdirk, Nunnink, Herd, O'Mara, and O'Rourke Title Company in Sedgwick County District Court.

Columbian Title asserted common-law claims for conversion, unfair competition/unjust enrichment, and breach of fiduciary duty, and a claim under the Kansas Uniform Trade Secrets Act (KUTSA) for the alleged misappropriation by the defendants of all or a portion of its title plant.

After the lawsuit had been filed, Columbian Title's counsel, Terry Moore, commented on the action to the Kansas City Business Journal. Moore explained that the allegations in the petition were based upon Columbian Title's investigation and further stated that "[y]ou don't want to accuse somebody of things like this unless you know you're right."

Also, after the lawsuit was filed, Columbian Title's representatives told inquiring customers that the lawsuit had been filed because they did not have any idea how O'Rourke Title Company was doing title work if it did not have Columbian Title's title plant.

On January 24, 1990, the Sedgwick County District Court dismissed Columbian Title's three common-law claims, concluding KUTSA was Columbian Title's exclusive remedy for the alleged wrongdoing by the defendants. The trial court further ruled that Columbian Title's damages would be measured by the number of times the title plant had been used by the defendants rather than by the value or development cost of the title plant.

On February 2, 1990, Columbian Title filed an application for permission to take an interlocutory appeal to this court. The application was denied.

On April 12, 1990, Columbian Title voluntarily dismissed its claims against all the defendants without prejudice. No appeal was taken by Columbian Title to the Kansas appellate courts following this action.

On June 15, 1990, Columbian Title filed a petition in the District Court of Johnson County, Kansas, naming as defendants Nunnink, Meyerdirk, O'Rourke, O'Rourke Title Company, Herd, O'Mara, Lawyers Title, and Kitch. The petition alleged breach of fiduciary duty, unjust enrichment, tortious conversion, and a violation of KUTSA.

Defendants O'Rourke, O'Rourke Title Company, O'Mara, Herd, and Kitch were not served until January 4, 1991. Defendants Meyerdirk and Nunnink were served on January 14, 1991.

Columbian Title subsequently voluntarily dismissed its claim against Kitch without prejudice.

The Johnson County District Court dismissed Columbian Title's claims for breach of fiduciary duty, unjust enrichment, and tortious conversion; finding those claims were barred by the doctrine of res judicata. The trial court further granted summary judgment in favor of the defendants; finding Columbian Title's KUTSA claim was time barred.

The trial court found that in 1987 Columbian Title had conducted an investigation into the possible theft or misappropriation of its title plant; that in November of 1987 Columbian Title had demanded to know from O'Rourke whether he was using its title plant; that on December 8, 1987, Columbian Title's counsel wrote a demand letter to O'Rourke; and that when O'Rourke failed to respond with an innocent explanation of how he was doing title reports, the cause of action accrued. The trial court determined as a matter of law that the cause of action accrued by December 31, 1987, and so was time barred because it had not been commenced by December 31, 1990. The trial court ruled Columbian Title's tolling and/or estoppel arguments were not viable.

Columbian Title appealed. The defendants cross-appealed. We affirm.

*Is Columbian Title's claim for misappropriation pursuant to KUTSA barred by the three-year statute of limitations set forth in K.S.A. 60-3325?*

Columbian Title contends the trial court erred by ruling its KUTSA claim was time barred. Columbian Title asserts the cause of action did not accrue until June of 1988 when two copies of its title plant actually were discovered in O'Rourke's control. Columbian Title argues that until the microfilm was discovered, it had no actual knowledge of the defendants' misappropriation, and the filing of the lawsuit in January of 1988 in Sedgwick County was only a step in its exercise of reasonable diligence to discover the misappropriation of its title plant. Columbian Title further asserts that when it discovered, or with reasonable diligence should have discovered, the misappropriation is a question of fact for the jury to decide.

Columbian Title makes several allegations of wrongdoing, denial, and concealment by the defendants without citing to the

record to support its assertions. Any material statement of fact made without reference to the record may be presumed to be without support in the record. Supreme Court Rule 6.02(d) (1992 Kan. Ct. R. Annot 25).

The Kansas Uniform Trade Secrets Act, K.S.A. 60-3320 *et seq.*, was enacted by our legislature in 1981, with minor revisions in 1988. KUTSA was patterned after the Uniform Trade Secrets Act (UTSA), promulgated by the National Conference of Commissioners on Uniform State Laws, which was approved and recommended for enactment in all the states on August 9, 1979. 12B Milgrim, Milgrim on Trade Secrets, Appendix A p. A-4 (1992); Unif. Trade Secrets Act, 14 U.L.A. 433 (1990). Since its approval by the Commissioners, 36 states have enacted legislation substantially patterned after UTSA. See Ariz. Rev. Stat. Ann. 44-401 *et seq.* (prefatory note) (1992 Supp.); Unif. Trade Secrets Act, 14 U.L.A. 433 (1990).

At issue herein is the statute of limitations provision for KUTSA, which is set forth in K.S.A. 60-3325:

"An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim."

When granting summary judgment in favor of the defendants, the trial court ruled actual discovery of the microfilm was not necessary to begin the running of the statute and found the steps taken by Columbian Title during 1987 established that it should have known of the misappropriation at least by December 31, 1987. As the defendants in the Johnson County action were not served until January 4, 1991, and January 14, 1991, Columbian Title's KUTSA claim was not deemed commenced until those dates (see K.S.A. 1992 Supp. 60-203[a][2] and so was determined to be time barred.

Our Supreme Court in *Williams v. Community Drive-in Theater, Inc.,* 214 Kan. 359, 364, 520 P.2d 1296 (1974), provided guidelines for a district court's consideration of a motion for summary judgment:

"A motion for summary judgment under the provisions of K.S.A. 60-256(c) is to be sustained only where the record conclusively shows there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law. In considering such a motion the movant's adversary is entitled to the benefit of all reasonable inferences and doubts that may be drawn from the facts under consideration. Where the facts presented in the motion are subject to conflicting interpretations or reasonable persons might differ as to their significance summary judgment is improper. It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law. Summary judgment should never be granted merely because the court may believe movant will prevail if the action is tried on the merits."

Similar rules apply when our appellate courts determine whether the trial court was correct to grant a summary judgment:

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [Citations omitted.] When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. [Citations omitted.]" *Patterson v. Brouhard*, 246 Kan. 700, 702-03, 792 P.2d 983 (1990).

"Where the defendant pleads a statute of limitations and moves for summary judgment and it appears that the action is barred by the appropriate statute of limitation and there is no genuine issue as to any material fact in connection with such statute, then the motion should be granted." *Hartman v. Stumbo*, 195 Kan. 634, Syl. ¶ 2, 408 P.2d 693 (1965).

We found no Kansas case that addresses what is required to trigger the running of the statute of limitations set forth in K.S.A. 60-3325. In *Lockridge v. Tweco Products, Inc.*, 209 Kan. 389, Syl. ¶ 2, 497 P.2d 131 (1972), a common-law trade secret case decided prior to the enactment of KUTSA, Commissioner Foth stated: "Where the nature of a trade secret is such that its secrecy is destroyed by mere use, a cause of action for its misappropriation arises and the statute of limitations commences to run at the time the first adverse use is reasonably ascertainable." In *Lockridge,* however, the plaintiff did not contest the trial court's finding that the defendants' first use and disclosure of his idea were reasonably ascertainable by him more than two years prior to the filing of his action (the court applied K.S.A. 60-513), making it unnecessary for our Supreme Court to reach this issue. 209 Kan. at 391, 399.

Our research reveals only one federal case, applying California law, which has addressed the commencement of the limitation period, *Ashton-Tate Corp. v. Ross*, 916 F.2d 516 (9th Cir. 1990). Cal. Civ. Code § 3426.6 (West 1992 Supp.) utilizes essentially the same language as K.S.A. 60-3325.

*Ashton-Tate* involved a suit between Ross, the developer of a computer spreadsheet program, and Ashton-Tate, another software developer, over the copyright ownership of the computer spreadsheet program and the alleged misappropriation of Ross' trade secrets by Ashton-Tate. The Ninth Circuit affirmed the district court's decision that Ross' claim for misappropriation of a trade secret was time barred.

In September 1984, Ross decided to collaborate with Wigginton on the development of a computer spreadsheet program for the Apple MacIntosh computer. In February 1985, Ross and Wigginton began to disagree about how they would publish and market their new program. In March 1985, Wigginton made a presentation to employees of Ashton-Tate to see if Ashton-Tate might be interested in publishing the spreadsheet program he and Ross were developing. 916 F.2d at 517. When Ross learned of Wigginton's meeting with Ashton-Tate, he confronted Wigginton on March 28, 1985. Wiggington informed Ross that he was going to work for Ashton-Tate and was going to take the user interface portion of their program prototype with him. 916 F.2d at 517.

In April 1985, Wigginton went to work for Ashton-Tate. He continued to work on the user interface and adapted it for use with a new program in which Ashton-Tate already had an interest. Eventually, Ashton-Tate released a spreadsheet program that incorporated Wigginton's user interface. 916 F.2d at 518.

In June 1985, Ross wrote Ashton-Tate, expressing concern that it was using his proprietary information to help develop a spreadsheet program. Ross received no response to this inquiry. During 1987, Ross again expressed concern to Ashton-Tate about the possible use of his proprietary information. Ross received assurances that "things would be worked out." 916 F.2d at 518.

On June 12, 1988, Ross demanded that Ashton-Tate compensate him for his contribution to the spreadsheet program incor-

porating Wigginton's user interface. On July 20, 1988, Ashton-Tate filed its complaint for declaratory relief.

In agreeing with the district court that Ross' trade secrets claims were time barred, the Ninth Circuit discussed the statute of limitations set forth in California's UTSA and stated:

"California only recently adopted the Uniform Trade Secrets Act (UTSA), but we believe the district court correctly interpreted the language of the statute and properly applied it to this dispute. The initial misappropriation in this case, if any, occurred in February 1985 when Wigginton disclosed Appellants' alleged trade secrets to Ashton-Tate. Ross learned of this incident in March, 1985. It is true that if Ashton-Tate subsequently used these secrets, that also constitutes misappropriation. The statute of limitations, however, specifically states that a continuing misappropriation constitutes a single claim. Thus Appellants' argument is unpersuasive that the limitation period only commenced to run in 1988 upon their discovery of Ashton-Tate's use of the secrets.

"The district court cited *Whittaker Corp. v. ExecuAir Corp,* 736 F.2d 1341 (1984), to support its view of when the 'misappropriation' occurred and the limitation period started to run. *ExecuAir* held that the misappropriation claims in that case accrued when the alleged owner of the trade secrets became aware of the third party's (ExecuAir) acquisition of those secrets. *Id.* at 1345. While *ExecuAir* came down prior to California's adoption of the UTSA, we think it expresses the rule intended by Cal. Civ. Code § 3426.6." 916 F.2d at 523-24.

The Ninth Circuit in *Ashton-Tate* was not required to determine whether Ross should have discovered the misappropriation by the exercise of reasonable diligence because the misappropriation had been actually discovered. Likewise, a reading of *Whittaker Corp. v. ExecuAir Corp.*, 736 F.2d 1341 (9th Cir. 1984), reveals that case also presented a situation in which the plaintiff actually discovered the misappropriation but failed to file suit within the limitations period. 736 F.2d at 1344-46.

None of our sister states have addressed the issue of when a plaintiff reasonably should have known of a defendant's misappropriation in the context of UTSA. The United States District Court for the Eastern District of Michigan, however, has addressed this issue in the context of a common-law claim for misappropriation of trade secrets in the case of *Pilkington Brothers, P.L.C. v. Guardian Industries Corp.* 230 U.S.P.Q. 300 (E.D. Mich. 1986). Michigan has not adopted UTSA.

Pilkington Brothers brought suit in November 1983 against Guardian for misappropriation of its trade secrets concerning a float glass process. Guardian moved for summary judgment, contending the cause of action accrued at the time of the first unauthorized disclosure and use, alleged to be in 1968, and that Pilkington Brothers' suit was time barred. Pilkington Brothers admitted at a mini-trial on the motion that it had actual knowledge of Guardian's use of its trade secrets in the spring of 1977. The court determined that under either a three- or a six-year statute of limitations, the statute would have run before November 1983; however, the court denied Guardian's motion for summary judgment because other issues in the case concerning agreements between the parties executed in 1972 and 1977 and their effect on Guardian's use of Pilkington Brothers' trade secrets needed further clarification. Based upon several factors, the court did conclude that Pilkington Brothers should have known of Guardian's use of its trade secrets in August of 1970 when production began at a plant owned by Guardian. 230 U.S.P.Q. at 300.

Applying common law, the court determined the limitations period would begin to run

"when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the existence of the acts constituting the cause of action. Plaintiff need not have discovered all the facts necessary to prove its claim. [Citation omitted.] All that is required is that plaintiff have sufficient facts to plead its cause of action." 230 U.S.P.Q. at 301.

The court further stated: " '[A]n injured party has a positive duty to use diligence in discovering his cause of action within the limitations period. Any fact that should excite his suspicion is the same as actual knowledge of his entire claim.' " 230 U.S.P.Q. at 301 (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 [6th Cir. 1975]).

We hold the Johnson County trial court did not err by determining the limitations period began to run on Columbian Title's KUTSA claim by December 31, 1987, when it reasonably should have known of the defendants' misappropriation. Our review of the record reveals many factors that support the trial court's conclusion:

1. O'Rourke Title Company was formed in 1987 by former employees of Columbian Title. After the business was formed,

O'Rourke Title Company hired several former employees of Columbian Title, including two employees who were knowledgeable about and had access to Columbian Title's title plant during their employment.

2. O'Rourke Title Company entered into an agreement with Fidelity and, subsequently, Security to purchase a 10-year title record chain for years 1977 to 1987, which in itself was not sufficient to allow O'Rourke Title Company to perform complete title work.

3. As early as April of 1987, four Columbian Title representatives believed O'Rourke had possession of a copy of a portion of Columbian Title's title plant.

4. In 1987, two representatives of Columbian Title discussed their suspicions with Columbian Title's and O'Rourke Title Company's competitors.

5. In September or October of 1987, Columbian Title employees noticed O'Rourke Title Company employees were not at the courthouse on a regular basis. A Columbian Title employee began following O'Rourke Title Company employees around the courthouse and reported they only checked the same information as employees of companies with complete title plants.

6. In the fall of 1987, representatives of Columbian Title, including its attorney, devised an elaborate plan to ascertain whether O'Rourke Title Company employees were using the courthouse records to perform title searches and to what extent they were doing so.

7. Columbian Title placed six contrived title orders with O'Rourke Title Company, which a representative believed requested sufficiently definite information to determine whether O'Rourke Title Company had Columbian Title's title plant.

8. Columbian Title hired a private investigator to observe the activities of the O'Rourke Title Company employees at the courthouse to determine whether the employees were gathering information from courthouse records to be included in the contrived orders.

9. Neither the private investigator nor the Columbian Title employees who were assisting him observed any O'Rourke Title

Company employee examine records at the courthouse that needed to be reviewed in order to fill the six orders.

10. As a result of the investigation, a Columbian Title representative believed "that we had gotten what we had anticipated getting."

11. Columbian Title confirmed with competitor title companies that they had not supplied O'Rourke Title Company with the information required to fill the six orders.

12. A representative of Columbian Title told a Lawyers Title representative that the investigation seemed to bear out the suspicions that O'Rourke Title Company had a copy of Columbian Title's Tub Sheets.

13. On November 24, 1987, Columbian Title representatives confronted O'Rourke in his office and questioned him regarding whether he had Columbian Title's title plant.

14. On December 8, 1987, Columbian Title's counsel wrote a letter to O'Rourke accusing him or his employees of wrongfully obtaining a copy of Columbian Title's title plant and using information from the title plant to conduct title searches. The letter further stated counsel was authorized to initiate litigation for O'Rourke's wrongful conduct, a thorough investigation had been conducted, and Columbian Title was confident the investigation substantially proved its contention.

15. After the lawsuit had been filed on January 28, 1988, in Sedgwick County, Columbian Title's counsel told the Kansas City Business Journal that the allegations in the petition were based upon Columbian Title's investigation and that "[y]ou don't want to accuse somebody of things like this unless you know you're right."

16. After the lawsuit was filed, Columbian Title's customers made inquiries and were told by Columbian Title representatives that the lawsuit had been filed because they didn't have any idea how O'Rourke Title Company was doing title work if it did not have Columbian Title's title plant.

We conclude that, under the circumstances, the question of when Columbian Title reasonably should have discovered the misappropriation was properly decided by the trial court and was not a jury question. It is the law in Kansas that "[w]here there

is evidence in dispute as to when the plaintiff's injury first became reasonably ascertainable, the question is one for the trier of fact." *Bick v. Peat Marwick & Main,* 14 Kan. App. 2d 699, Syl. ¶ 3, 799 P.2d 94, *rev. denied* 247 Kan. 703 (1990). When the evidence concerning when the misappropriation was discovered, or with reasonable diligence should have been discovered, is not in dispute, as is the case herein, the question becomes one for the trial court to decide. See *Miller v. Foulston, Siefkin, Powers & Eberhardt,* 246 Kan. 450, 465-66, 790 P.2d 404 (1990); *U.S.D. No. 490 v. Celotex Corp,* 6 Kan. App. 2d 346, 353, 629 P.2d 196, *rev. denied* 230 Kan. 819 (1981).

We agree with the trial court that Columbian Title had discovered the misappropriation by December 31, 1987.

*Are the defendants estopped from asserting the statute of limitations as a defense based upon their continuing affirmative denials of wrongdoing and concealment of material facts?*

Columbian Title contends the defendants' denials of wrongdoing and concealment of material facts should estop their reliance upon the statute of limitations as a bar to its KUTSA claim. Columbian Title also asserts the defendants' acts of concealment tolled the statute of limitations until the misappropriation was actually discovered. Finally, Columbian Title contends justice requires that its KUTSA claim be adjudicated on the merits and not be barred by the statute of limitations. Columbian Title argues that under the standard of review of a trial court's ruling on a summary judgment motion, this court is required to accept the allegations of concealment set forth in its petition as true.

It is well established in Kansas that

" 'concealment and fraud constitute an implied exception to the statute of limitations, and a party who wrongfully conceals material facts, and thereby prevents discovery of his wrong, or the fact that a cause of action has accrued against him, is not allowed to take advantage of his own wrong.' " *Railway Co. v. Grain Co.,* 68 Kan. 585, 586, 75 Pac. 1051 (1904).

The defendants' denials of wrongdoing in the December 18, 1987, letter and throughout the course of the litigation in Sedgwick County and Johnson County do not estop their reliance upon the statute of limitations as a defense or toll the running of the statute. See *State of Colo. v. Western Paving Const. Co.,* 630 F. Supp. 206, 209-10 (D. Colo. 1986), *aff'd* 841 F.2d 1025

(10th Cir.), *cert. denied* 488 U.S. 870 (1988); *Campbell v. Upjohn Co.*, 498 F. Supp. 722, 728 (W.D. Mich. 1980), *aff'd* 676 F.2d 1122 (6th Cir. 1981); *Dayco Corporation v. Firestone Tire & Rubber Co.*, 386 F. Supp. 546, 549 (N.D. Ohio 1974), *aff'd* 523 F.2d 389 (6th Cir. 1975); *Clark v. AiResearch Mfg. Co. of Ariz., Inc.*, 138 Ariz. 240, 243, 673 P.2d 984 (1983); *Pilkington Brothers, P.L.C. v. Guardian Industries Corp.*, 230 U.S.P.Q. at 301-02.

In *Pilkington Brothers,* Judge Suhrheinrich stated:

"Further, plaintiff's argument that the statute is tolled because of defendant's alleged misrepresentations, when taken to its logical extreme, leads to an absurdity. No defendant is ever going to admit stealing another party's trade secrets. If it did, there would be no cause of action. If the statute is tolled so long as defendant denies the use of plaintiff's trade secrets, the statute would never begin to run." 230 U.S.P.Q. at 302.

Columbian Title makes continued allegations that certain actions taken by the defendants, particularly O'Rourke, amounted to concealment of material facts. In support of its allegations, Columbian Title cites only to the petitions it filed in Johnson County District Court and in Sedgwick County District Court. Our review of the record *that was before the trial court* when it granted summary judgment in favor of the defendants reveals no support for Columbian Title's allegations of concealment.

"Summary judgment may be granted when the evidence shows no liability as a matter of law and where the central facts are not in dispute. [Citation omitted.] When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. [Citation omitted.]" *Knudsen v. Kansas Gas & Electric Co.*, 248 Kan. 469, 483, 807 P.2d 71 (1991).

"The party opposing summary judgment . . . has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case." *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 307, 756 P.2d 416 (1988). "To defeat a properly supported motion for summary judgment, the nonmovant must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 250 Kan. 754, 762, 829 P.2d 907 (1992). "[T]he burden of proving facts sufficient to toll the statute of limitations is upon the plaintiff." *Slayden v. Sixta,* 250 Kan. 23, Syl. ¶ 1, 825 P.2d 119 (1992).

Supreme Court Rule 141 (1992 Kan. Ct. R. Annot. 124) provides in relevant part:

"No motion for summary judgment shall be heard or deemed finally submitted for decision until:

(a) The moving party has filed with the court and served on opposing counsel a memorandum or brief setting forth concisely in separately numbered paragraphs the uncontroverted contentions of fact relied upon by said movant (with precise references to pages, lines and/or paragraphs of transcripts, depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents contained in the court file and otherwise included in the record); and

(b) Any party opposing said motion has filed and served on the moving party within twenty-one (21) days thereafter, unless the time is extended by court order, a memorandum or brief setting forth in separately numbered paragraphs (corresponding to the numbered paragraphs of movant's memorandum or brief) a statement whether each factual contention of movant is controverted, and if controverted, a concise summary of conflicting testimony or evidence, and any additional genuine issues of material fact which preclude summary judgment (with precise references as required in paragraph [a], *supra*)."

Compliance with Supreme Court Rule 141 is mandatory. *McCullough v. Bethany Med. Center,* 235 Kan. 732, Syl. ¶ 1, 683 P.2d 1258 (1984).

Commissioner Harman in *Hartman v. Stumbo,* 195 Kan. 634, 638, 408 P.2d 693 (1965), opined:

"In *Schreffler v. Bowles,* 153 F.2d 1 (10th Cir. 1946) the court said:

'The salutary purpose of Rule 56 is to permit speedy and expeditious disposal of cases where the pleadings do not as a matter of fact present any substantial question for determination. Flimsy or transparent charges or allegations are insufficient to sustain a justiciable controversy requiring the submission thereof. The purpose of the rule is to permit the trier to pierce formal allegations of facts in pleadings and grant relief by summary judgment when it appears from uncontroverted facts set forth in affidavits, depositions or admissions on file that there are as a matter of fact no genuine issues for trial.' (p.3)"

See *Meyer, Executor v. Benelli,* 197 Kan. 98, 100-01, 415 P.2d 415 (1966) ("Neither is the fact that the allegations in the pleadings create genuine issues of fact controlling. [K.S.A. 60-256] was intended to permit a party to pierce the allegation of facts in his opponent's pleadings by affidavits and discovery, thus controlling the formal issues presented by the pleadings.").

In this case, the defendants' brief submitted in support of their motion for summary judgment included portions of deposition testimony from various individuals and an affidavit, which set forth the actions taken by Columbian Title that allegedly showed Columbian Title reasonably should have known by the end of December 1987 that a misappropriation of its title plant had occurred. Columbian Title's brief in opposition to the defendants' motion for summary judgment alleged the defendants had denied any wrongdoing and had concealed material facts, thereby tolling the limitations period. Columbian Title did not submit to the trial court any affidavits, deposition testimony, admissions on file, or other discovery in support of these allegations, but relied only upon the allegations set forth in its petition.

Columbian Title's allegations in its petition are not sufficient to create a genuine issue of fact. No evidence in support of its allegations of concealment was before the trial court. We find Columbian Title failed to establish that the defendants committed acts of fraudulent concealment.

On appeal, Columbian Title has included in the record two volumes consisting of the complete deposition testimony of Pat O'Rourke. This deposition testimony, however, was not before the Johnson County trial judge when he ruled on the summary judgment motion. Our appellate courts have no power to consider evidence that was not submitted to the trial court. See *Solomon v. Lampl,* 135 Kan. 469, 480, 11 P.2d 1028 (1932).

Further, "[n]either arguments before the trial court nor assertions raised in an appellate brief constitute evidence or are sufficient to satisfy inadequacies of the record." *In re Marriage of Nasica,* 12 Kan. App. 2d 794, 797, 758 P.2d 240, *rev. denied* 243 Kan. 778 (1988). We find the trial court did not err by concluding Columbian Title's estoppel and tolling arguments were not viable.

Justice does not demand that the statute of limitations be tolled in this case. In *Welch v. City of Kansas City,* 204 Kan. 765, 771, 465 P.2d 951 (1970), Justice Fontron stated:

"Finally, the plaintiffs insist that the ends of justice would be served by granting them their day in court, despite the fact their action was commenced out of time. The same suggestion, we presume, could be advanced

by every litigant who by inattention, inadvertence or otherwise, had let the time slip by for bringing his lawsuit.

"It has been said that statutes of limitation are statutes of repose, precluding presentation of stale claims and encouraging diligence on the part of those whose rights have been infringed. In furthering these objectives, such statutes serve a worthy and useful purpose, and we are not at liberty to ignore them completely."

Columbian Title had ample opportunity following the voluntary dismissal without prejudice of its KUTSA claim in Sedgwick County to bring an action in Johnson County well within the limitations period set forth in K.S.A. 60-3325. The ends of justice will not save Columbian Title from its lack of diligence in this situation.

*Are Columbian Title's claims for breach of fiduciary duty, unjust enrichment, and tortious conversion barred by the statute of limitations?*

The defendants argued to the trial court that Columbian Title's common-law claims also were barred by the statute of limitations. We agree and find that all of Columbian Title's common-law claims are barred by the two-year statute of limitations set forth in K.S.A. 1992 Supp. 60-513(a). See *Miller v. Foulston, Siefkin, Powers & Eberhardt,* 246 Kan. at 465; *Clark Jewelers v. Satterthwaite,* 8 Kan. App. 2d 569, 572, 662 P.2d 1301 (1983).

Even if we assume the cause of action for each common-law claim began to accrue in June of 1988, actual service in the Johnson County action did not occur until January of 1991, well beyond the expiration of the limitations period. Although the trial court did not rely on the expiration of the statute of limitations as a ground for dismissing the common-law claims, if the trial court's decision is correct for any reason, it must be affirmed. *D-1 Constructors, Ltd. v. U.S.D. No. 229,* 14 Kan. App. 2d 245, 246, 788 P.2d 289 (1990).

Because we find the common-law claims are barred by the statute of limitations (even if those claims are otherwise valid, which is doubtful), we need not find those claims are also barred by the doctrine of res judicata, although that would clearly be the case.

The remaining issues asserted by Columbian Title on appeal were not raised before the trial court in the Johnson County

action and cannot be heard for the first time on appeal. See *Kansas Dept. of Revenue v. Coca Cola Co.,* 240 Kan. 548, 552, 731 P.2d 273 (1987). Also, the time for appeal from rulings by the trial court in the Sedgwick County litigation has expired, which further precludes our jurisdiction over these issues. See *Anderson v. United Cab Co.,* 8 Kan. App. 2d 694, 695, 666 P.2d 725, *rev. denied* 234 Kan. 1076 (1983).

Because we find all of Columbian Title's claims to be barred by the pertinent statutes of limitations, we need not reach the issues raised by the defendants in their cross-appeal. See *Kimberlin v. City of Topeka,* 238 Kan. 299, 301, 710 P.2d 682 (1985).

Affirmed.