NOT DESIGNATED FOR PUBLICATION

No. 124,965

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TRACEY MURRAY and the ESTATE OF ROBERT MURRAY,
*Appellants*,

v.

MIRACORP, INC., NTTS, INC., LANE GOEBEL, and SHANE GOEBEL,
*Appellees*.

MEMORANDUM OPINION

Appeal from Johnson District Court; ROBERT J. WONNELL, judge. Opinion filed January 13, 2023. Affirmed.

*Stanley B. Bachman*, *Andrew L. Speicher*, and *Sue L. Becker*, of Morefield Speicher Bachman, LC, of Overland Park, for appellants.

*Ryan M. Paulus*, of Cornerstone Law Firm, Of Kansas City, Missouri, for appellees.

Before ARNOLD-BURGER, C.J., BRUNS and HURST, JJ.

ARNOLD-BURGER: Generally, the statute of limitations begins to run as soon as an injury occurs, or, if the injury is not "reasonably ascertainable" as soon as the injury "becomes reasonably ascertainable to the injured party." K.S.A. 60-513(b). As this court explained in *Foxfield Villa Associates, LLC v. Robben*, 57 Kan. App. 2d 122, 127, 449 P.3d 1210 (2019), "[t]he phrase 'reasonably ascertainable' presents the injured party with a duty to reasonably investigate available sources containing facts relevant to the party's claim."

1

Robert Murray had a 5% interest in Miracorp, Inc. Lane Goebel had the majority of Miracorp shares. For several years, Robert did not think that Miracorp was worth much and the financial documents he received seemed to reinforce that belief. But in 2011, he learned that Garmin was using the Miracorp logo which made him think that Miracorp might be making more money than he originally believed. He hired an attorney who sent an informal and a formal demand letter to Lane seeking to inspect Miracorp's books and records. But it wasn't until 2016 that they sent another demand letter to Lane. The eventual inspection of records revealed that Lane had been acting in bad faith. He had been involved in a sexual harassment case which led to a more than one million-dollar judgment against him and Miracorp, he had transferred nearly all of Miracorp's assets to a new company and had been paying himself large bonuses using Miracorp's funds.

Robert and his wife Tracey (Murrays) sued Lane, Shane Goebel, Miracorp, and the new company, NTTS, Inc., in 2019. The district court granted the defendants' motion for summary judgment and dismissed the Murrays' lawsuit finding that all of their claims were barred by the statute of limitations. After reviewing the evidence in the light most favorable to the Murrays we find that summary judgment was proper here.

FACTUAL AND PROCEDURAL HISTORY

On February 7, 2019, the Murrays sued Miracorp, Inc., NTTS, Inc., Lane Goebel, and Shane Goebel. According to the petition, in the 1980s, Robert gained a 5% stockholder interest in Miracorp. Miracorp, which did business as "National Truck & Trailer Services" (or NTTS, but legally different from NTTS, Inc.), is a Kansas Corporation which, in part, provided truck drivers with a directory for various trucking needs. Lane was a majority shareholder of Miracorp for all relevant time periods.

Robert, who passed away in 2020, received K-1 tax returns from Miracorp from at least 1998 to 2015. Yet Miracorp did not provide financial statements or other information about Miracorp to Robert. Nor were any shareholder meetings held or, if they were held, Robert was not notified.

In 2009, a Miracorp employee sued Miracorp and Lane alleging discrimination and retaliation because Lane sexually harassed the employee and forced her to have sex with him to keep her job. *Walls v. MiraCorp, Inc.*, No. 09-2112-JAR, 2011 WL 3651346 (D. Kan. 2011) (unpublished opinion). Another similar lawsuit was filed by a different employee the same year. *Ratzlaff v. MiraCorp, Inc.*, No. 09-2133, 2010 WL 3769201 (D. Kan. 2010) (unpublished opinion). In the first suit, the jury entered judgment against Miracorp and Lane awarding the plaintiff more than $100,000 in back wages, more than $350,000 in compensatory damages, and $250,000 for battery. Additionally, the court assessed more than two million dollars against Miracorp as punitive damages. The same judgment found that Shane, Lane's nephew, was aware of and condoned Lane's actions. In addition, the court found that Lane was taking annual bonuses of $500,000.

In May 2011, the plaintiff in the sexual harassment suit sought garnishment through the Johnson County District Court. The court issued garnishment orders, which were served on Miracorp's bank in June 2011. The court quashed the garnishment order that same day at an emergency hearing. On June 14, 2011, Miracorp's bank acknowledged the quashed order. Three days later, NTTS, Inc. was formed as a new Kansas corporation.

Around the same time, Miracorp stopped having accounts receivable, and it transferred most of its assets to NTTS, Inc. on Lane's order. The only asset left on Miracorp's book was an account receivable for around $830,000. Miracorp received nothing in exchange. In essence, Miracorp ceased to have a function. NTTS, Inc. had essentially the same employees as Miracorp, employee's job duties were basically the

3

same, almost all of Miracorp's customers began doing business with NTTS, Inc., and NTTS, Inc. had the same office location, phone numbers, fax number, and web page as Miracorp. Shane also testified that NTTS, Inc. took over Miracorp's database, computers, and software programs. The database is considered a trade secret and contains proprietary information.

Miracorp's and NTTS, Inc.'s CPA, Leon Logan, testified that Lane charged large sums of personal expenses to Miracorp and NTTS, Inc. For example, one was coded as an "account receivable shareholder" for $736,770.77. Logan explained that the account would typically be zeroed out at the end of the year and classified as distributions or bonus. According to Logan, the most significant payments were quarterly estimated tax payments. Lane received millions in distributions between 2009 and 2020. Lane also loaned his friend Robert Smith more than $800,000, using Miracorp's funds, and explained that he understood that he could do so because he was that company's majority stockholder. Lane also bought a jet, possibly using Miracorp's funds. Miracorp then disbursed the jet to Lane, and Lane leased the jet to the company. Miracorp paid for a hanger for the jet.

Before 2011, the Murrays did not seem to have any indication that their Miracorp stock had any substantial value. But in 2011, they learned that Garmin had an application which used the Miracorp logo. According to Tracey, once they learned that Garmin was using the Miracorp logo, the Murrays tried to contact Lane through an attorney letter. The letter, sent on July 22, 2011, states, in part: "Rob Murray has been in to see me. He has told me that (1) he is a 5% shareholder of Miracorp; (2) no meetings have ever been held; (3) no distributions have been made; and (4) many other things. Now he has seen Garmin using Miracorp's name and logo." The Murrays did not receive a response to the letter.

The Murrays' attorney sent a demand letter on August 22, 2011, which stated:

"Mr. Murray hereby makes a formal demand pursuant to K.S.A. § 17-6510 to inspect the books and records of Miracorp, Inc. Mr. Murray intends to examine the books and records of Miracorp, Inc. for the purpose of determining whether the company has been mismanaged and whether other stockholders have received distributions or other benefits from the company that he has not received."

In 2011, the Schedule K-1 form issued by Miracorp to Robert reflected a business income loss of more than $15,000, and for the first time revealed a royalty payment of $300. In 2012, the Schedule K-1 form reflected that there was no ordinary business income.

At some point in 2012, Robert went to Miracorp's office to visit with Lane, but Lane would not meet with him.

Around the same time, Robert's health began to deteriorate, and he was diagnosed with dementia and Alzheimer's disease. The Murrays dropped their investigation into Shane and Miracorp and focused on Robert's health. The couple moved to Arizona in 2016. While packing for their move, they found a letter from Lane, dated December 1989, which confirmed Robert's 5% ownership in Miracorp. Finding the letter reignited the Murrays' interest in the financial performance of Miracorp and the value of Robert's stock.

At some point in 2016, Tracey conducted a computer search to see what she could learn about Miracorp. She discovered that Miracorp and Lane were defendants in two sexual harassment lawsuits that led to large judgments. The Murrays retained an attorney who sent another letter Lane on October 13, 2016. In that letter, the Murrays mention the sexual harassment suit, judgment, and satisfaction of the judgment. Robert again demanded to inspect the books and records of Miracorp to determine if there was any information relating to litigation involving the company, the financial situation of the

company, use of company assets to satisfy judgments, and possible mismanagement of the company.

Two weeks later, on October 25, 2016, Robert sued Lane requesting a shareholder inspection of Miracorp's corporate records. Nearly a year later, on October 24, 2017, the district court ordered that Miracorp allow the Murrays to inspect the corporate records. After obtaining the documents, they learned more about Miracorp's management including the sexual harassment suits, how the judgments in those cases were paid, the Garmin licensing agreement, the formation of NTTS, Inc., the loan to Smith, bonuses paid to Lane, and corporate purchases such as the jet.

Less than two years after receiving that information, the Murrays filed this suit raising several causes of action. First, they alleged that Lane and Shane breached their fiduciary duty through self-dealing that harmed the company and other stockholders. Second, they alleged that Lane, Shane, and NTTS, Inc., committed conversion by assigning the Miracorp directory to NTTS, Inc. In count three, Tracey and Robert sought an accounting of Miracorp, Lane, Shane, and NTTS, Inc. Fourth, they alleged that Lane and Miracorp committed fraud by silence for failing to disclose various expenses, payments, and other compensation to Robert.

After Robert passed away, Tracey filed an amended petition including Robert's estate as a proper party. In the amended petition, dated March 4, 2021, they included an unjust enrichment claim against Lane, Shane, and NTTS, Inc. They also included a breach of implied contract claim against Lane, arguing that Lane breached an implied contract between stockholders to pursue Miracorp's business. And the Murrays sought a declaratory judgment stating that Miracorp, NTTS, Inc., and Lane were all alter egos of each other.

In a subsequent amended petition, dated March 31, 2021, the Murrays added a new count of misappropriation of trade secrets against Lane, Shane, and NTTS, Inc.

In sum, the final amended petition included these claims:

1. Breach of Fiduciary Duties
2. Unjust Enrichment
3. Breach of Implied Contract
4. Conversion
5. Fraud
6. An Action for Declaratory Judgment
7. An Action for an Accounting
8. Misappropriation of Trade Secrets

The parties filed competing motions for summary judgment. Relevant on appeal is the defendant's motion for summary judgment which argued that all the Murrays' claims were time barred by applicable statutes of limitations. The Murrays responded to the defendant's motion for summary judgment, arguing, in applicable part, that their claims were not barred by statutes of limitations.

The district court granted the defendant's motion for summary judgment, finding that each of the Murrays' claims were time barred by the statute of limitations.

The Murrays moved to amend the judgment. The district court denied that motion in January 2022.

The Murrays timely appealed.

7

On appeal, the Murrays argue that the district court erred by finding that each of their claims was barred by the applicable statute of limitations. It did so by granting the defense's motion for summary judgment. In addressing a request for summary judgment, the district court must view the evidence most favorably to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. An appellate court applies the same standards in reviewing the entry of a summary judgment. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). Because a summary judgment presents a question of law—it entails the application of legal principles to uncontroverted facts—an appellate court owes no deference to the district court's decision to grant the motion, and review is unlimited. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009).

I. THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT ON ALL CLAIMS THAT HAD A TWO-YEAR STATUTE OF LIMITATIONS

The parties agree that the two-year statute of limitations set out in K.S.A. 60-513(a) applies to five of the Murrays' claims: (1) Breach of Fiduciary Duties, (2) Unjust Enrichment, (3) Conversion, (4) Fraud, and (5) Action for Declaratory Judgment. The contention between the parties arises from K.S.A. 60-513(b) which states that, except as otherwise provided:

> "[T]he causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

8

The Murrays argue that the district court erred when it found that "'all claims were ascertainable and could have been filed in or before 2011'" because "[the Murrays] had no reason to investigate for unknown claims and injuries because Kansas law requires [Miracorp], as fiduciaries, to communicate all material facts . . . to [the Murrays]" and because "there is no evidence in the record of anything that would have triggered a duty by [the Murrays] to investigate for unknown injuries for unknown claims."

Generally, the statute of limitations begins to run as soon as the injury occurs, or, if the injury is not "reasonably ascertainable" as soon as the injury "becomes reasonably ascertainable to the injured party." K.S.A. 60-513(b). As this court explained in *Foxfield Villa Associates, LLC*, 57 Kan. App. 2d at 127, "[t]he phrase 'reasonably ascertainable' presents the injured party with a duty to reasonably investigate available sources containing facts relevant to the party's claim." This creates an objective standard based on examining the circumstances surrounding the case. *P.W.P. v. L.S.*, 266 Kan. 417, 425, 969 P.2d 896 (1998).

For example, in *Foxfield*, Foxfield (FVA) argued that its negligence claims against Robben were not time barred because FVA could not reasonably establish that Robben acted negligently until August 2016—almost five years after FVA filed a different suit in the case against a different defendant. This court was unconvinced, noting that by the time the first suit was filed FVA "knew it was injured" and "had a duty to reasonably investigate all available sources for facts relevant to its injuries." 57 Kan. App. 2d at 128.

Nor was this court convinced by FVA's arguments that whether something was reasonably ascertainable is a fact question that must be submitted to a jury. This court acknowledged that the "trier of fact weighs the disputed evidence to determine when a plaintiff's substantial injury first appears or becomes reasonably ascertainable." 57 Kan. App. 2d at 129. But when the defendant raises the statute of limitations summary judgment can be appropriate so long as there is no dispute or genuine issue as to when the

9

statute of limitations began to run. 57 Kan. App. 2d at 129. In *Foxfield*, this court held that summary judgment was appropriate because FVA filed its first suit alleging injury in 2011, which, at the very least, started the statute of limitations clock because it showed that FVA knew that it had been injured—even if it did not know that Robben, allegedly, caused the injury. 57 Kan. App. 2d at 129-30.

Here, the appellants argue that the duty to discover facts is reduced when there is a fiduciary relationship between the parties.

A. *There may be a reduced duty to investigate because of the fiduciary relationship.*

"Kansas has always imposed a very strict fiduciary duty on officers and directors of a corporation to act in the best interest of the corporation and its stockholders." *Newton v. Hornblower, Inc.*, 224 Kan. 506, 514, 582 P.2d 1136 (1978). Appellees (collectively Miracorp) do not contest that they had a fiduciary relationship with the Murrays related to their stock ownership.

The Murrays argue that because Miracorp were fiduciaries, they had a duty to communicate material facts and because of that duty, the Murrays had a lesser duty of due diligence to discover certain facts that could cause the statute of limitations to begin to run. The Kansas Supreme Court addressed this issue in *Wolf v. Brungardt*, 215 Kan. 272, 284, 524 P.2d 726 (1974), when the court held that, in some cases there is a reduced duty of due diligence to discover potential claims when a fiduciary relationship is involved.

In *Wolf*, the court was tasked with determining whether the statute of limitations barred an action for fraud and breach of contract. 215 Kan. at 279. In doing so, the court noted that the statute of limitations does not start to accrue, in an action for fraud, "until

10

the fraud is discovered." 215 Kan. at 280-81. The fraud at issue in the case was potentially not discovered within the statute of limitations, thus, the "appellants' entire argument is directed to whether or not the Wolfs could have discovered the fraud before [the date that would have put them outside the statute of limitations], by the exercise of reasonable diligence." 215 Kan. at 281.

Wolf argued that they were justified in relying on the appellants' representations because appellants were fiduciaries. As the court put it, Wolf argued "the law does not deprive a defrauded party of relief because he had opportunity to investigate, when his lack of knowledge was such that the investigation would disclose nothing to him." 215 Kan. at 281. The court then acknowledged that the general rule requires the statute of limitations to begin running when a person discovers facts that would cause a "reasonably prudent person to investigate, and which, if investigated with reasonable diligence, would lead to knowledge of the fraud." 215 Kan. at 281-82.

But the situation is different where:

"one party . . . has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud." 215 Kan. at 282.

Thus, "[m]any decisions of [the Kansas Supreme Court] hold the law does not deprive a defrauded party of relief because he had opportunity to investigate when his lack of knowledge was such that the investigation would disclose nothing to him." 215 Kan. at 282.

In *Wolf*, the court found that the plaintiff did not have a duty to investigate that triggered the statute of limitations at an earlier date. The court reasoned that Wolf, who

11

was 19 and unexperienced in business could not have discovered the fraud because he lacked the knowledge to do so. As the court saw it, the only way Wolf could have discovered evidence of fraud would have been to request information directly from the person defrauding him. 215 Kan. at 283.

In reaching its decision the court noted that where "there is nothing to put [Wolf] on inquiry they may continue to rely on the representations made by the appellants." 215 Kan. at 283. Wolf had no duty to investigate further. The court then reiterated that in ordinary business transactions a person is "expected to exercise reasonable prudence and not rely upon others with whom they deal to care for and protect their interests" but the requirement did not go so far that the law would ignore or protect intentional fraud against the unwary. 215 Kan. at 283.

Under the facts of *Wolf*, the court reasoned that there was nothing to cause Wolf to suspect the fraud and that Wolf could "continue to rely upon the [other party's] assertions and the statute of limitations will not commence to run until the defrauded party has some information which will put him on inquiry to discover the true facts." 215 Kan. at 284. And because Wolf accused his fiduciary of fraud "the duty of due diligence to discover the true facts [was] reduced." 215 Kan. at 284. The court held under the facts of the case, there was nothing to put Wolf on notice that things were not as they seemed within the business at a date that would have barred the suit by the statute of limitations. Thus, Wolf's suit was not time barred. 215 Kan. at 285.

Here the Murrays argue that because Lane was their fiduciary, they had a reduced duty of due diligence to discover the facts surrounding their eventual suit. And because of that reduced duty of due diligence, the Murrays argue that their suit is not time barred by the applicable statute of limitations. And given the Kansas Supreme Court's holding in *Wolf*, the Murrays are correct—they did have a reduced duty to investigate. See 215 Kan. at 284. But that is not without limits; if the Murrays were aware of something that put

12

them "on inquiry" of suspected wrongdoing then the law would not protect their continued reliance on Lane's and Miracorp's statements. See 215 Kan. at 283-84.

*B. The Murrays knew there were problems at Miracorp in 2011.*

The problem with the Murrays' argument is that even with a reduced duty to investigate, they knew that all was not as it seemed with Lane, Shane, and Miracorp well before they brought their suit in this case. The earliest date would be in 2011, when the Murrays learned that Garmin was using Miracorp's name and logo. That alone was enough to prod the Murrays to investigate.

On July 21, 2011, Robert visited his attorney and then sent him a follow-up email asking his attorney to ask Lane Goebel, the president of NTTS, to provide him with information regarding his shareholder tax form that he did not receive in 2010 and "any other pertinent information that a 5% shareholder should have knowledge of." As requested, the next day, July 22, 2011, the Murrays' attorney sent an informal demand letter to Lane asserting that Robert was a shareholder at Miracorp, had not been informed of or involved in meetings, had not received distributions, and "many other things." They asserted that they reserved the right to inspect the books—apparently recognizing that such action may be necessary. And the letter concluded that if no response was received by July 29, the Murrays would "assume the worst and act accordingly."

After not receiving a response, the Murrays' attorney sent another identical demand letter this time to Lane in care of NTTS, giving him until August 8, 2011, to respond or he would "assume the worst and act accordingly." When the attorney failed to receive a response, the firm sent a third formal demand letter to Miracorp on August 22, 2011, stating that Robert sought to "examine the books and records of Miracorp, Inc., for the purpose of determining whether the company has been mismanaged and whether other stockholders have received distributions or other benefits from the company that he

13

has not received" within the next 10 days. The Murrays clearly had concerns that Lane and Miracorp were not acting in their best interest, the company had been mismanaged, and the Murrays had not received the distributions or other benefits to which they were entitled.

Miracorp also points out that the Schedule K-1 that Robert received for 2011 also revealed that several corporate assets, such as a trailer, truck, forklift, and some computers were disposed of in 2011. Additionally, Robert's 2012 Schedule K-1 showed that Miracorp had no ordinary business income or loss.

If the Murrays had chosen to continue to pursue their suspicions in 2011, they could have inspected Miracorp's books and records—as they stated they intended to do—and likely would have learned about many, if not all, of their current complaints. At the very least it would have given them enough information to realize that they needed to conduct further investigation. The Murrays complain on appeal that Lane is a "master of deceit and concealment," but in 2011, when they first had suspicions that something was not right at Miracorp they took initial steps to investigate those suspicions. But they dropped their search, understandably, in favor of focusing on Robert's health. That does not change the fact that they were suspicious, if not outright aware, that Lane and Miracorp were not behaving as they should.

The Murrays next acted in 2016, over two years before filing this lawsuit, when Tracey conducted a computer search and learned that Lane and Miracorp were defendants in two sexual harassment suits that led to large judgments. The Murrays retained a new attorney who sent a letter to Lane on October 13, 2016, and explicitly mentioned the suit, judgment, and that the judgment had been satisfied. Robert again demanded to inspect the books and records.

14

The Murrays filed a shareholder inspection suit on October 25, 2016. Still, Lane and Miracorp fought the suit, and the court did not enter judgment in the Murrays' favor until October 24, 2017.

The Murrays filed this case less than two years after receiving the books and records. But, as stated above, Kansas law does not require a potential plaintiff to have exact knowledge of the injury that could lead to a suit to begin the running of the time frame for the statute of limitations. Instead, the injury merely needs to be "reasonably ascertainable." K.S.A. 60-513(b). There is a lesser standard where there is a fiduciary relationship involved, but when the relevant knowledge is within a fair and reasonable reach and can be discovered by reasonable diligence that protection is weakened. See *Wolf*, 215 Kan. at 281-82.

Here, the relevant knowledge was within a fair and reasonable reach and the Murrays could have discovered it through reasonable diligence as early as 2011 when their first attorney sent an informal demand letter followed by a formal demand letter to Lane and Miracorp about an inspection of Miracorp's books and records.

The Murrays first cause of action, breach of fiduciary duties, asserts that Lane and Shane engaged in improper self-dealing, misused Miracorp funds, and otherwise harmed Miracorp to the detriment of Miracorp and its shareholders. If the Murrays had diligently pursued their desire to inspect Miracorp's books and records in 2011 they could have discovered those injuries.

The Murrays' second cause of action, unjust enrichment, faces the same problem. The Murrays argue that Lane, Shane, and NTTS, Inc., unjustly enriched themselves by transferring funds and assets from Miracorp to NTTS, Inc. NTTS, Inc. was created in June 2011—before Robert sent his demand to inspect Miracorp's books and records. If the Murrays had followed through on their desire to inspect Miracorp's books and

15

records, they would have discovered Miracorp had transferred most of its assets to a newly created company.

The same problem plagues the Murrays' claims of conversion and fraud. Robert and Tracey were suspicious as early as 2011 that all was not as it seemed with Miracorp and failed to follow through on their suspicions. If they had done so, they would have learned that they did not get distributions, assets were taken from Miracorp, and that statements made or withheld by Lane and Miracorp were less than honest. But they did not follow through and instead let the possible suit lie until several years had passed.

As for Murrays' cause of action for declaratory judgment—they spend little time addressing the issue in their brief and it seems largely irrelevant in the grand scheme of the case. The claim is for a declaratory judgment that Miracorp and NTTS, Inc. are the alter egos of Lane Goebel, that NTTS, Inc. is the alter ego of Miracorp and as such Lane Goebel should be personally liable.

A potential plaintiff has a duty to investigate reasonably available sources and the Murrays started to do so in 2011 when they sent their first demand letter. In their brief the Murrays argue that they had no duty to investigate and that nothing would have triggered a duty to investigate. But that argument is betrayed by the fact that they actually did begin to investigate.

The Murrays' argument that knowledge of one wrongful act does not trigger a duty to investigate for *any* possible wrongful act is also unpersuasive in the context of this case. This is not like their stated hypothetical of two unrelated injuries caused by the same party. Instead, each of the causes of action discussed above could have been discovered by the Murrays through a books and records inspection. And while we are sympathetic to the Murrays' arguments that Lane and Shane should not be able to shelter

16

behind their withholding of facts that led to this suit, the fact remains that those concealed facts were discoverable through a books and records inspection as early as 2011.

Nor would the fiduciary relationship between the parties toll the statute of limitations as the Murrays argue. In *Foxfield*, this court acknowledged that statute of limitations may be tolled when a party engages in fraudulent or intentional concealment and "'in the absence of a fiduciary or confidential relationship, there [is] something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action.'" *Foxfield*, 57 Kan. App. 2d at 130 (quoting *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 564, 608 P.2d 936 [1980]).

The Kansas Supreme Court examined its decision in *Friends University*, in *Miller v. Foulston, Siefkin*, *Powers & Eberhardt*, 246 Kan. 450, 470, 790 P.2d 404 (1990), and found that Miller could not estop the defendant from raising a statute of limitations claim because nothing suggested why due diligence from Miller "did not lead or could not have led to the discovery" of the facts leading to the causes of action. *Miller* involved a former law partner suing his former firm about a fee arrangement and compensation from a large recovery in a case the firm worked on. But he brought his suit outside the statute of limitations. While denying his equitable estoppel argument, the Kansas Supreme Court noted that Miller was aware of the potential recovery and associated attorney fees at an earlier date and failed to take steps at that time to determine facts that could have led to filing the suit at an earlier date. 246 Kan. at 470-71. The court reasoned that equitable estoppel "is based upon the principle that a person is held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances, has in good faith relied thereon." 246 Kan. at 469.

While the Murrays do not couch their argument as an equitable estoppel argument similar reasoning can apply here. In 2011, the Murrays had suspicions that Lane and

17

Miracorp were concealing information about the value of Miracorp. They sought to rectify that by hiring an attorney and having that attorney send a demand letter. They then failed to follow through on that search and now seek to hide behind their willful ignorance to toll the statute of limitations—foreclosing Miracorp from raising it as a defense. As this court stated in *McCaffree Financial Corp. v. Nunnink*, 18 Kan. App. 2d 40, 56, 847 P.2d 1321 (1993) (quoting *Pilkington Brothers, P.L.C. v. Guardian Industries Corp.*, 230 U.S.P.Q. 300, 302, 1986 WL 9876 [E.D. Mich. 1986]), when taken to its "'logical extreme,'" a plaintiff's argument that a statute of limitations is tolled:

> "'because of defendant's alleged misrepresentations . . . leads to an absurdity. No defendant is ever going to admit stealing another party's trade secrets. If it did, there would be no cause of action. If the statute is tolled so long as defendant denies the use of plaintiff's trade secrets, the statute would never begin to run.'"

In essence, a holding in this case that the statute of limitations was tolled would render statutes of limitations in similar cases meaningless. This is not a situation in which the Murrays had no idea that anything was wrong. They had suspicions that business was not being done correctly at Miracorp, but unfortunate life circumstances—through no fault of Lane, Shane, or Miracorp—prevented the Murrays from pursuing their suspicions. That should not stop the clock from running or defendants could potentially never be free from the specter of litigation for past actions.

In sum, the Murrays were, at the least, suspicious that Miracorp was being mismanaged and they were not receiving distributions in an amount reflective of Miracorp's income as early as 2011. To assuage their suspicions, they demanded to inspect Miracorp's books and records, which would have led to the discovery of the issues they later raised in this suit. However, before going beyond their initial demand letters, doctors diagnosed Robert with dementia and Alzheimer disease and the Murrays did not pursue their suspicions and instead focused on Robert's health. Several years

18

passed and they renewed their search for answers about Miracorp's value and eventually learned of the troublesome facts that lead to this suit. Unfortunately for the Murrays, they were too late. They had sufficient knowledge in 2011 to make the injury they suffered "reasonably ascertainable" which started the clock on the statute of limitations. See *Wolf*, 215 Kan. at 283-84. They cannot now continue to rely on Miracorp's statements, or lack thereof, to toll the statute of limitations because that was essentially willful ignorance. They were suspicious enough of wrongdoing in 2011 to hire an attorney to seek inspection of the books and records but failed to follow through.

The Murrays' claims which are covered by a two-year statute of limitations are time barred. They filed their first lawsuit for shareholder inspection of the records in October 2016, and filed this lawsuit in February 2019, but they first learned of potential wrongdoing in 2011. The district court did not err in granting Miracorp's motion for summary judgment seeking their dismissal. See K.S.A. 60-513.

II.     THE DISTRICT COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT ON THE
        MURRAYS' CLAIMS THAT HAD A THREE-YEAR STATUTE OF LIMITATIONS

        *A. The misappropriation of trade secrets claim is time barred.*

The time the Murrays had to bring their claim for misappropriation of trade secrets is governed by K.S.A. 60-3325 which states that "[a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Moreover, the Kansas Supreme Court has held that a claim for misappropriation of trade secrets is not a continuing tort. *Lockridge v. Tweco Products, Inc.*, 209 Kan. 389, Syl. ¶ 3, 497 P.2d 131 (1972) ("Where the value of a trade secret is destroyed by its first adverse use, continued use thereafter does not constitute a continuing tort.").

19

The parties agree that the Murrays did not actually learn about the alleged misappropriation until December 2017. But, as in the discussion above, the issue is when the Murrays could or should have discovered the alleged misappropriation. In this case, further investigation would have revealed the first adverse use of the trade secret.

NTTS, Inc. was formed in June 2011. Around the same time almost all of Miracorp's assets and accounts were transferred to NTTS, Inc. The Murrays knew in 2011 that Garmin had an application which used the Miracorp logo. If the Murrays had followed through with their books and records inspection in late 2011, they could have learned about the transfer of Miracorp's assets to NTTS, Inc., which would include Miracorp's database.

If the Murrays had exercised reasonable diligence in 2011, they could have learned about the misappropriation of trade secrets in a timely manner. Yet they failed to pursue their suspicions in 2011. Thus, the district court did not err when it determined that the Murrays' misappropriation of trade secrets claim was time barred. See K.S.A. 60-3325.

*B. The breach of implied contract claim is time barred.*

Under K.S.A. 60-512, "[a]ll actions upon contracts, obligations or liabilities expressed or implied but not in writing" are required to be brought within three years. Appellants' breach of an implied contract claim presumed that an implied contract existed between Lane and other stockholders "to pursue the purpose for which [Miracorp was] chartered." By failing to do so, the Murrays alleged that Lane breached that implied contract.

20

The same analysis above generally applies here: the Murrays did not bring their claim within three years of the injury. Thus, their claim is time barred. See K.S.A. 60-512.

In addition, K.S.A. 60-512 does not include a reasonably ascertainable provision. See *LCL v. Falen*, 53 Kan. App. 2d 651, 664-65, 390 P.3d 571 (2017) (noting that K.S.A. 60-512 lacks a reasonably ascertainable provision and upholding district court decision to grant summary judgment based on statute of limitations).

The only remaining claim raised by the Murrays in their petition is their claim for accounting, which sought to determine the various benefits Lane, Shane, and NTTS, Inc., received through their conduct with Miracorp. That said, they did not address this issue on appeal. An issue not briefed is considered waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

III.    CONCLUSION

"Limitations periods created by statute are grounded in a number of worthy policy considerations. They encourage the prompt recovery of damages; they penalize plaintiffs who have not been industrious in pursuing their claims; they 'afford security against stale demands when the circumstances would be unfavorable to a just examination and decision'; they relieve defendants of the prolonged fear of litigation; they prevent fraudulent claims from being asserted; and they '"remedy . . . the general inconvenience resulting from delay in the assertion of a legal right which it is practicable to assert. [Citations omitted.]"'" *Lothian v. City of Detroit*, 414 Mich. 160, 166-167, 324 N.W.2d 9 (1982).

Although there is some language in the Murrays' briefing and their fourth amended petition which would suggest that they may be claiming that the causes of action they allege constitute continuing acts, they do not develop that argument in their appellate

21

brief. They focus only on the point in which they first could have discovered bad acts on the part of Miracorp. And all bad acts alleged in their fourth amended petition relate to events before February 18, 2012. In their brief, they do mention a continuation of bad acts in relation to their declaratory judgment claim:

> "Plaintiffs have alleged NTTS, Inc. is the alter ego and mere continuation of Miracorp, Inc., and both are the alter egos of Lane Goebel. . . . The significance of this claim is that Lane Goebel continues, each and every year, to cause injuries to Plaintiffs for millions of dollars by, for example, failing to pay Plaintiffs distributions, and continuing to pay his friend Bob Smith $2,000 per month, purchasing a building with company funds, etc."

But they provide no legal argument about the impact of any post-2017 continuing injuries on the application of the statute of limitations, nor do they separately account for what those might be. A point raised incidentally in a brief and not argued therein is considered abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

Given the allegations against Lane, Shane, and Miracorp, a holding that bars the Murrays from pursuing their claims seems harsh. In fact, it is one we do not relish making. But we are bound to follow the law. The Murrays had a chance to pursue their claims in 2011 and made the decision, understandably, to focus on Robert's health. Kansas law does not permit a potential plaintiff who knows of possible wrongdoing to sit on that wrongdoing indefinitely. The potential plaintiff must pursue their claims promptly. Lane's position as a fiduciary does not change that fact given that the Murrays were, at least, suspicious of potential wrongdoing or withholding of information as early as 2011—yet they failed to pursue those suspicions for several years.

The district court did not err when it found that the Murrays claims were barred by the statute of limitations and granted summary judgment in favor of Miracorp on all claims.

22

Affirmed.

* * *

HURST, J., dissenting: I disagree that summary judgment on all of the Murrays' claims was appropriate. I believe the issue of whether the Murrays' injuries were reasonably ascertainable in 2011 was sufficiently in dispute to warrant submitting the issue to the trier of fact for resolution. I therefore respectfully dissent.

The Murrays assert five causes of action that have a two-year statute of limitations: (1) breach of fiduciary duties, (2) unjust enrichment, (3) conversion, (4) fraud, and (5) action for declaratory judgment. See K.S.A. 60-513(a). The statute of limitations provides that, for each of these causes of action, "the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party." K.S.A. 60-513(b). Therefore, to grant summary judgment in favor of Miracorp on these claims, the district court would have to find that there was no dispute or genuine issue as to the time when the statute began to run and, as a matter of law, the Murrays' injury in each claim must have been reasonably ascertainable more than two years prior to filing this action. *Foxfield Villa Associates, LLC v. Robben*, 57 Kan. App. 2d 122, 129, 449 P.3d 1210 (2019).

However, the facts establishing when the limitation period commenced *are* in dispute and "the trier of fact weighs the disputed evidence to determine when a plaintiff's substantial injury first appears or becomes reasonably ascertainable." 57 Kan. App. 2d at 129. As the Kansas Supreme Court has explained:

"Where the affirmative defense of the statute of limitations is asserted, summary judgment may be proper where there is no dispute or genuine issue as to the time when the statute commenced to run. But . . . where the evidence is in dispute as to when substantial injury first appears or becomes reasonably

23

ascertainable, the issue is for determination by the trier of fact." *Gilger v. Lee Constr., Inc.*, 249 Kan. 307, 311, 820 P.2d 390 (1991).

Here, the parties dispute when the Murrays' injuries became reasonably ascertainable and, by extension, when the statute of limitations began to run. The parties' dispute notwithstanding, the district court held that, as a matter of law, the Murrays' injuries became reasonably ascertainable in 2011 when they first hired an attorney to contact Miracorp and demand information, because their inquiry, seeing the logo used by a third party, and the K-1 filing triggered the Murrays' duty to investigate. The district court found that the Murrays' conduct did not satisfy that duty.

The majority's contention appears to be that the Murrays did not do enough to satisfy their burden to reasonably investigate available sources for facts relevant to their injuries and that, had the Murrays done *more* in 2011, they would have discovered their injuries. But those are questions of fact precluding summary judgment in this case. See e.g., *LCL v. Falen*, 308 Kan. 573, 585, 422 P.3d 1166 (2018) (remanding where factual disputes regarding date when injury became reasonably ascertainable existed); *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 32, 378 P.3d 1090 (2016).

In *Armstrong*, the Kansas Supreme Court held that summary judgment was improper where "undisputed material facts were inadequate to conclude as a matter of law that any [injury] was reasonably ascertainable" and remanded the case for further proceedings regarding the applicable statute of limitations. 305 Kan. at 32. In *Falen*, the court later expounded its reasoning and decision in *Armstrong*:

"Because of our inability as an appellate court to do fact-finding on whether further followup was necessary for 'reasonable' conduct on [plaintiff]'s part and whether any of the other avenues for investigation alleged to be available would have disclosed the [defendant]'s wrongful conduct, we could not 'conclude as a matter of law that any [injury] was reasonably ascertainable.' We therefore reversed the district court's summary

24

judgment in favor of the [defendant] based on the expiration of the statute of limitations. [Citation omitted]." *Falen*, 308 Kan. at 585 (quoting *Armstrong*, 305 Kan. at 32).

Like *Armstrong* and *Falen*, this case presents a situation in which the factual development thus far, even if undisputed by the parties, does not present an adequate basis upon which this court can hold, as a matter of law, that the Murrays' injuries were reasonably ascertainable in 2011. Nor can I say, as a matter of law, that the Murrays' investigation in 2011 was not reasonable, or that their duty to investigate at that time as minority shareholders required them to sue to obtain the information necessary to demonstrate their injury.

I agree that the Murrays first became suspicious that they *might* have suffered an injury in 2011, and they investigated whether they had, in fact, suffered an injury. I also agree that through their investigation they did not actually discover whether they had been injured at that time. It is possible that in 2011 the Murrays could have reasonably done more to investigate whether they had suffered an injury, and that such reasonable investigation would have demonstrated the injury. However, it may also be possible that such additional investigation would not have disclosed the injury. Moreover, it is possible that Miracorp and Lane concealed the information upon which the existence of an injury could have been determined at that time. These are factual questions that need to be resolved by the trier of fact—not by the court at the summary judgment stage.

In 2011, the Murrays may have done what a reasonable minority shareholder in their position would have done—hired an attorney to obtain the relevant information from Miracorp—and nevertheless were unable to ascertain their injuries. Therefore, the trier of fact could determine that the Murrays' injuries were not reasonably ascertainable in 2011 and, by extension, that the statute of limitations did not begin to run until a later date. This is particularly relevant given the Murrays' reduced burden to investigate because the defendants owed them a fiduciary duty. See *Wolf v. Brungardt*, 215 Kan.

25

272, 284, 524 P.2d 726 (1974). Additionally, whether defendants acted intentionally to conceal their wrongdoing, and thus tolling or negating the statute of limitations is a question of fact. To toll the applicable statute of limitations, the defendants' "concealment must be fraudulent or intentional." *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 564, 608 P.2d 936 (1980). The parties obviously dispute whether the defendants intentionally concealed their wrongdoing.

For the same reason, summary judgment was not proper on the Murrays' claim of misappropriation of trade secrets. See K.S.A. 60-3325. However, I agree with the majority that the district court did not err in granting summary judgment on the Murrays' breach of implied contract claim because the governing statute of limitations—K.S.A. 60-512—does not include a requirement that the breach or injury be "reasonably ascertainable." Compare K.S.A. 60-513(b) with K.S.A. 60-512; see also *Pizel v. Zuspann*, 247 Kan. 54, 74, 795 P.2d 42, *modified on other grounds* 247 Kan. 699, 803 P.2d 205 (1990) ("A cause of action for breach of contract accrues when a contract is breached by the failure to do the thing agreed to, irrespective of any knowledge on the part of the plaintiff or of any actual injury it causes."). I also agree that the Murrays' claim for accounting is waived or abandoned. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

I would reverse the district court's grant of summary judgment on the following six claims: (1) breach of fiduciary duties; (2) unjust enrichment; (3) conversion; (4) fraud; (5) action for declaratory judgment; and (6) misappropriation of trade secrets. I would also remand to the district court to permit the trier of fact to resolve the parties' dispute concerning when the Murrays' injuries pertaining to each claim became reasonably ascertainable. Accordingly, I respectfully dissent.